1   Daniel S. Mason (Cal. Bar No. 54065)
Zelle, Hofmann, Voelbel, Mason & Gette, LLP

2   44 Montgomery Street, Suite 3400
San Francisco, CA 94104

3   Telephone: (415) 693-0700
Facsimile:  (415) 693-0770

4   Email: dmason@zelle.com

5   Attorneys for Defendants
CAPETOWN DIAMOND CORPORATION,

6   CAPETOWN LUXURY GROUP, CARL
MARCUS, AND ROSE MARCUS

7

8              **UNITED STATES DISTRICT COURT**

9             **NORTHERN DISTRICT OF CALIFORNIA**

10

11   ROLEX WATCH U.S.A., INC.,       Case No. 3:08:MC-80125-MMC (underlying action pending in the U.S. District Court for the

12        Plaintiff,         N. District of Georgia, Case No. 1:03-CV-3001-CC)

13   v.

14   CAPETOWN DIAMOND
CORPORATION, CAPETOWN

15   LUXURY GROUP, CARL MARCUS, and
ROSE MARCUS,

16

17        Defendants.

**DEFENDANTS' RESPONSE TO MOTION TO QUASH SUBPOENA FOR DEPOSITION OF J. THOMAS MCCARTHY**

18                 **INTRODUCTION**

19      Professor J. Thomas McCarthy ("Professor McCarthy") seeks to quash Defendants'

20   subpoena for the production of documents and testimony on the grounds that he is an "un-retained

21   expert" who is protected from discovery under Fed. R. Civ. P. 45(c)(3)(B)(ii).  Professor

22   McCarthy insists that Defendants are seeking his expert opinions and that he will be deprived of

23   his intellectual property without compensation if required to testify in this case.  Contrary to these

24   arguments, Defendants do not seek Professor McCarthy's expert opinions, but rather seek very

25   limited factual information about whether certain facts having a direct bearing on the pending

26   case were known to Professor McCarthy at the time that he gave expert testimony when retained

27

28

STITES &
HARBISON, PLLC
ATTORNEYS AT LAW
ATLANTA

CA285:000CA:165868:1:ATLANTA

DEFENDANTS' RESPONSE TO MOTION TO
QUASH SUBPOENA FOR DEPOSITION OF J.
THOMAS MCCARTHY 3:08:MC-80125-MMC

on behalf of Rolex in two separate actions, which, Rolex has argued, should control the Court's

decision in the above-captioned action.  Because the testimony and evidence sought do not fall

within the purview of Rule 45(c)(3)(B)(ii), Defendants' subpoena should not be quashed, and

even if the testimony and evidence sought did fall within the protections of Rule 45(c)(3)(B)(ii),

Defendants have a substantial need for the information that cannot be otherwise met without

undue hardship and will agree to pay Professor McCarthy reasonable compensation.

## BACKGROUND FACTS

Rolex is seeking a permanent injunction against Defendants from the sale of <u>any new or</u>

<u>used</u> Rolex watches based upon a 13 year old Settlement Agreement and Consent Judgment

(collectively, "the 1990 Consent Judgment"). The 1990 Consent Judgment authorizes Defendants

to sell Rolex watches subject to certain restrictions relating to advertising and disclaimers

regarding the absence of any relationship between Rolex and Defendants.  The 1990 Consent

Judgment also authorizes Defendants to add certain accessories to genuine Rolex watches,

including non-genuine (that is, non-Rolex) parts, such as bezels, dials, bracelets, clasps, diamonds

and other jewelry, provided only that Defendants disclose that the aftermarket parts are not

genuine Rolex parts and that their use may void any remaining Rolex warranty. (See the 1990

Consent Judgment attached to the Declaration of Donald R. Andersen as Exhibit A.)  Rolex did

not claim or reserve any right under the 1990 Consent Judgment to exercise any quality control

over the addition of non-genuine parts to genuine Rolex watches, and specifically disclaimed and

disavowed any requirement to do so.

The 1990 Consent Judgment was filed under seal.  The 1990 Consent Judgment contained

a confidentiality provision, prohibiting the parties to the 1990 Consent Judgment, Rolex and

Defendants, from disclosing the existence of the 1990 Consent Judgment.  The parties kept that

Consent Judgment a secret until the institution of this action by Rolex in 2003, alleging breach of

DEFENDANTS' RESPONSE TO MOTION TO
QUASH SUBPOENA FOR DEPOSITION OF J.
THOMAS MCCARTHY 3:08:MC-80125-MMC

the 1990 Consent Judgment.  In this action, Rolex also alleges, among other things, that Defendants have violated state and federal law by "counterfeiting" Rolex watches and infringing upon Rolex's trademark by adding the very non-genuine diamond dials, bezels, bracelets and clasps to genuine Rolex watches that it is authorized to add under the 1990 Consent Judgment.

In support of its counterfeiting claims, Rolex relies principally on two opinions, *Rolex Watch, U.S.A., Inc. v. Michel Co.,* 179 F.3d 704 (9th Cir. 1999) and *Rolex Watch, U.S.A., Inc. v. Meese,* 158 F.3d 816 (5th Cir. 1998).  Both of these cases held that the alteration of Rolex watches with non-genuine parts, such as diamond dials, bezels, bracelets, and clasps, constitutes trademark infringement and "counterfeiting" under the Lanham Act, 15 U.S.C. Section 1114(1), even though the defendants in both of those cases disclosed that the added parts were not genuine and not authorized by Rolex – just as Rolex had expressly authorized Defendants to do in the 1990 Consent Judgment.  In *Meece* and *Michel,* the respective circuit courts, including a panel of this Circuit, held that the alteration of the watches via addition of the non-genuine parts resulted in a new product or "new construction," warranting the complete injunction of sales of those enhanced watches, even if the sales were accompanied by appropriate disclosures regarding the use of non-genuine parts.  The respective circuit courts ultimately concluded that the enhanced watches were "counterfeits" and that they infringed and diluted Rolex's trademark by causing the Rolex name to be associated with an inferior product, regardless of whether disclosures were made.

In both of those cases, Rolex relied upon the expert testimony of Professor McCarthy.  Specifically, Professor McCarthy testified that the addition of non-genuine parts, such as diamond dials, bezels, bracelets, and clasps, to new Rolex watches amounts to trademark infringement or counterfeiting under the Lanham Act.  (See testimony of Professor McCarthy in *Michel* and *Meese*, Declaration of Donald R. Andersen, Exhibit B, especially p. 17, line 13 to p. 18, line 8;

1
2
and Exhibit C, p. 71, lines 13-16; p. 71, line 24 to p. 75, line 18; p. 77, lines 20-23; and p. 99, lines 1-11).

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
     There is no mention in Professor McCarthy's testimony and no discussion in either the *Meece* or *Michel* cases of the existence of the 1990 Consent Judgment, pursuant to which Rolex permitted Defendants to perform, without Rolex's monitoring or supervision, the very alterations and enhancements it claims amounted to "counterfeiting" and trademark infringement in the *Meece* and *Michel* cases. This is a material omission, which as to Rolex rises to the level of fraud upon those courts, because the permission granted to Defendants under the 1990 Consent Judgment—to alter Rolex watches with non-genuine parts outside of Rolex's monitoring and supervision—means either that the activities in question are not really counterfeiting or trademark infringement at all or that Rolex has granted Defendants a license to counterfeit its watches and infringe upon its trademark without any quality control and therefore has abandoned any rights to trademark protection for genuine Rolex watches to which aftermarket diamond accessories have been added. The existence of the 1990 Consent Judgment vitiates Rolex's arguments in the *Meece* and *Michel* cases, and the absence of any mention of this Consent Judgment in those cases, including in Professor McCarthy's testimony, suggests that Rolex concealed the existence of that Consent Judgment from both Professor McCarthy and the courts.

21
22
23
24
25
26
27
28
     Defendants seek to depose Professor McCarthy not only for the purpose of finding out whether the 1990 Consent Judgment was disclosed to and reviewed by him, but also whether the existence of the 1990 Consent Judgment would have been material to his testimony, and whether the existence of the 1990 Consent Judgment would have changed his testimony – testimony that he was retained by Rolex to provide and for which he has already been compensated. Therefore, Defendants are not seeking to compel expert testimony from Professor McCarthy without compensation;, they are simply seeking to cross-examine him as to the basis for those

STITES &
HARBISON, PLLC
ATTORNEYS AT LAW
ATLANTA

CA285:000CA:165868:1:ATLANTA          - 4 -

DEFENDANTS' RESPONSE TO MOTION TO
QUASH SUBPOENA FOR DEPOSITION OF J.
THOMAS MCCARTHY 3:08:MC-80125-MMC

compensated opinions in the cases upon which Rolex now relies. For the reasons set forth below, Fed. R. Civ. P. 45(c)(3)(B)(ii) is inapplicable to the information and testimony requested in Defendants' subpoena, and even if it were, this Court should exercise its discretion to permit the testimony.

## ARGUMENT AND POINTS OF AUTHORITY

The purpose of Fed. R. Civ. P. 45(c)(3)(B)(ii) is to protect experts from being required to provide expert advice or assistance without proper compensation. As the Advisory Committee notes explain, "[e]xperts are not exempt from the duty to give evidence."[1] Rather, experts are required to respond to a subpoena and give evidence unless the compulsion to give evidence threatens their "intellectual property" and denies them "the opportunity to bargain for the value of their services." Fed. R. Civ. P. (c)(3)(B)(ii), Advisory Committee's Note.

The Rule, on its face, does not apply to the testimony sought from Professor McCarthy. The Rule permits a court, in its discretion, to modify or quash a subpoena if the subpoena requires "disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party." Fed. R. Civ. P. (c)(3)(B)(ii). At the outset, it is worth noting that Defendants' subpoena does not seek "results from the expert's study that was not requested by a party." Rather, Defendants' subpoena seeks factual information related to opinions previously expressed on behalf of Rolex, a party to this action, in two prior actions, which are directly relevant to facts in dispute in the instant action. In *Schering Corp. v. Amgen, Inc.*, Nos. Civ. A. 98-97 MMS, Civ.A. MMJ, 1998 WL 552944 (D. Del. Aug. 4, 1998), cited by Professor McCarthy in support of his arguments, the district court specifically found that the expert's testimony did not result "from a study made at

---

[1] In fact, "[t]he weight of authority holds that, although it is not the usual practice, a court does have the power to subpoena an expert witness, and though it cannot require him to conduct any examinations or experiments to prepare himself for trial, it can require him to state whatever opinions he may have previously formed." *Carter-Wallace, Inc. v. Otte*, 474 F.2d 529 (2d Cir. 1972).

STITES &
HARBISON, PLLC
ATTORNEYS AT LAW
ATLANTA

DEFENDANTS' RESPONSE TO MOTION TO QUASH SUBPOENA FOR DEPOSITION OF J. THOMAS MCCARTHY 3:08:MC-80125-MMC

the request of either Schering/Biogen or Amgen [the parties to the action], but on the request of Genentech/Hoffman-La Roche, who is not a party to this case."

Furthermore, unlike like the requesting party in *Amgen,* Defendants are not attempting to compel Professor McCarthy to provide expert opinion.  In *Amgen*, the experts were asked to testify "as to the work required to express an interferon protein or the knowledge of one of ordinary skill in the art."   This testimony is clearly nothing other than expert testimony.  In the instant case, by contrast, Defendants simply seek to learn:  (1) whether Professor McCarthy was aware of the 1990 Consent Judgment when he offered his opinions in the *Meece* and *Michel* cases; (2) whether the provisions of the 1990 Consent Judgment would have been material to the opinions that Professor McCarthy rendered in the *Meece* and *Michel* cases; and (3) whether knowledge of the provisions of the 1990 Consent Judgment would have changed Professor McCarthy's opinions in the *Meece* and *Michel* cases.  While this testimony would certainly relate to Professor McCarthy's prior testimony on behalf of Rolex, it is not, in and of itself, an expert opinion.  Accordingly, the testimony sought does not fall within the parameters of  Fed. R. Civ. P. 45(c)(3)(B)(ii).

Moreover, Professor McCarthy's motion to quash is clearly not interposed in order to further the purpose behind the Rule, to prevent the "taking" of Professor McCarthy's intellectual property without compensation.  Professor McCarthy, like the expert in *Arkwright Mut. Ins. Co. v. National Union Fire Ins. Co.*, 148 F.R.D. 552  (S.D. W. Va. 1993)*,* was fully compensated by Rolex for his testimony in the *Meece* and *Michel* cases.  Thus, "[g]iven this prior compensation, [Professor McCarthy] will not suffer a ''taking' of intellectual property' by appearing at the noticed deposition and testifying [at most] to the opinions he has already formulated at [Rolex's] expense."  Id. at 557-8.[2]  In *Amgen*, the court similarly noted that to the extent that one of the

---

[2] The Second Circuit, in *Carter-Wallace,* noted, "[s]ince the witnesses involved here had

STITES &
HARBISON, PLLC
ATTORNEYS AT LAW
ATLANTA

DEFENDANTS' RESPONSE TO MOTION TO QUASH SUBPOENA FOR DEPOSITION OF J. THOMAS MCCARTHY 3:08:MC-80125-MMC

experts "would be asked to testify to previously formed or expressed opinion, this factor would also favor compelling her to testify." *Id*. at 10.  Moreover, as shown above, Defendants do not seek to compel Professor McCarthy's expert opinion or the production of his "intellectual property."  As to the questions of whether Professor McCarthy was aware of the 1990 Consent Judgment and whether knowledge would have been material to or changed to his opinions, again, these are questions of fact, not opinion, the answers to which could not conceivably be classified as Professor McCarthy's "intellectual property."   Accordingly, the purpose behind the Rule, the protection of the expert's "intellectual property" and "the opportunity to bargain for the value of [his] services," will in no way be served by quashing the subpoena and forbidding Professor McCarthy's testimony.

Even if this Court concludes that Professor McCarthy's testimony and information fall within the scope of the Rule, the decision whether to quash or modify a subpoena pursuant to Fed. R. Civ. P.  45(c)(3)(B)(ii) is still within the discretion of the court.  *Arkwright Mut. Ins. Co. v. National Union Fire Ins. Co.*, 148 F.R.D. 552  (S.D. W. Va. 1993).  The Court's discretion is guided, as stated in the Advisory Committee Comments, by the factors discussed in *Kaufman v. Edelstein*, 539 F.2d 811 (2d Cir. 1976):

> Appropriate factors for consideration  . . . would be the degree to which the expert is being called because of his knowledge of facts relevant to the case rather than in order to give opinion testimony, the difference between testifying to a previously formed or expressed opinion and forming a new one; the possibility that, for other reasons, the witness is a unique expert; the extent to which the calling party is able to show the unlikelihood that any comparable witness will willingly testify; [and] the degree to which the witness is able to show that he has been oppressed by having continually to testify . . .

Id. 558 n. 12 (citing *Kaufman*, 539 F.2d at 822); see also *Young v. U.S.*, 181 F.R.D. 344,

previously testified as to their opinions, it would seem that they could have been subpoenaed to repeat their testimony here."  *Carter-Wallace, Inc. v. Otte*, 474 F.2d 529 (2d Cir. 1974).

DEFENDANTS' RESPONSE TO MOTION TO
QUASH SUBPOENA FOR DEPOSITION OF J.
THOMAS MCCARTHY 3:08:MC-80125-MMC

348 (W.D. Tex. 1997).

The *Kaufman v. Edelstein* factors militate in favor of denying the Motion to Quash. Professor McCarthy has been subpoenaed to provide information relating to factual issues, relevant to the pending case. (1) Professor McCarthy is being asked to testify as to his knowledge of facts that have relevancy to this case rather than for the expression of his opinion. (2) Defendants do not seek any new opinions from Professor McCarthy, but at most seek information about his previously formed and expressed opinions. (3) Professor McCarthy is a unique witness, being the only witness to offer opinions in the *Meece* and *Michel* cases. (4) Because Professor McCarthy was the only person to offer expert testimony in *Meece* and *Michel*, he is the only possible witness. (5) Professor McCarthy has provided no evidence that he will be "oppressed" by having to provide testimony on these facts "continually," and it is unlikely that this will happen, because the testimony at issue relates to a Consent Judgment between the parties to this case.

The documents requested from Professor McCarthy are similarly outside the scope of Fed. R. Civ. P. 45(c)(3)(B)(ii) and are not protected from disclosure. The documentary evidence requested is limited to the information supplied to and used by Professor McCarthy in formulating his opinions in the *Meece* and *Michel* cases. This is precisely the type of information that was held in *Friedland v. TIC—The Indus. Co.*, Civ.A. No. 04-CV-01263-PSF-MEH, 2006 WL 2583113 (D. Colo. Sept. 5, 2006), cited by Professor McCarthy, to be outside the scope of and unprotected by Rule Fed. R. Civ. P. 45(c)(3)(B)(ii). The Court in *Friedland* held that these documents[3] were not protected by the Rule because they did not constitute the expert's "intellectual property." The court contrasted these documents with documents such as summaries, spreadsheets, databases, expert reports, and opinions, which the court did conclude were part of the expert's intellectual property and therefore protected by the Rule. Defendants are

---

[3] The documents at issue were billing records.

STITES &
HARBISON, PLLC
ATTORNEYS AT LAW
ATLANTA

DEFENDANTS' RESPONSE TO MOTION TO QUASH SUBPOENA FOR DEPOSITION OF J. THOMAS MCCARTHY 3:08:MC-80125-MMC

not seeking any such materials in this case. And, to the extent that Defendants' subpoena could be construed to include such materials, Defendants will agree to modify their subpoena to exclude such documents.

Moreover, even if this Court concludes that the documents and testimony sought from Professor McCarthy fall within the protection of Fed. R. Civ. P. 45(c)(3)(B)(ii) and that the *Kaufman* factors do not militate in favor of permitting the testimony, Defendants still would be entitled to the information sought on the grounds that Defendants (a) have a "substantial need for the material that cannot be otherwise met without undue hardship" and (b) will provide Professor McCarthy with reasonable compensation for his testimony and his efforts in producing documents. Fed. R. Civ. P. 45(c)(3)(C). See also *Schering Corp. v. Amgen, Inc.*, Nos. Civ. A. 98-97 MMS, Civ.A. MMJ, 1998 WL 552944 (D. Del. Aug. 4, 1998). To establish undue hardship, "[a] party must show that the substantial equivalent cannot be obtained through other means." *Friedland v. TIC—The Indus. Co.*, Civ.A. No. 04-CV-01263-PSF-MEH, 2006 WL 2583113 (D. Colo. Sept. 5, 2006)(citing *Connelly v. Dun & Bradstreet, Inc.*, 96 F.R.D. 339, 342 (D. Mass. 1982). Such is the case here. Rolex relied upon Professor McCarthy's testimony in the *Meece* and *Michel* cases, which ultimately held that the addition of non-genuine accessories to genuine Rolex watches constituted counterfeiting and trademark infringement. Defendants believe that Professor McCarthy would not have offered the opinions that he offered in *Meece* and *Michel* had he known that Rolex permitted Defendants to do under the 1990 Consent Judgment what they alleged in Meece and Michel amounted to counterfeiting and trademark infringement. Only the opposing party and Professor McCarthy know whether in fact Professor McCarthy was aware of the 1990 Consent Judgment, and only Professor McCarthy knows whether the existence of the 1990 Consent Judgment might have been material to or affected his opinion. Accordingly, there is no other means by which Defendants can obtain the evidence

DEFENDANTS' RESPONSE TO MOTION TO QUASH SUBPOENA FOR DEPOSITION OF J. THOMAS MCCARTHY 3:08:MC-80125-MMC

1   sought.

2       Finally, if this Court ultimately concludes that Professor McCarthy is in genuine peril of

3   having his "intellectual property" taken without compensation, then Defendants are willing to pay

4   reasonable compensation to Professor McCarthy for his appearance and testimony at a deposition

5   and for the time spent gathering the documents responsive to the subpoena.

6

7                              **CONCLUSION**

8       For the reasons set forth herein, the testimony and documents requested from Professor

9   McCarthy are not protected from disclosure under Fed. R. Civ. P. 45(c)(3)(B)(ii).  Professor

10  McCarthy is not being compelled to offer his expert opinions and work product without

11  compensation.  Even if Professor McCarthy's testimony and information fall within the scope of

12  Fed. R. Civ. P. 45(c)(3)(B)(ii), then this court should exercise its discretion to compel the

13  testimony and information sought for the reasons set forth herein, and, if required, Defendants are

14  prepared to pay reasonable compensation to Professor McCarthy.  Accordingly, the motion to

15  quash should be denied.

16

17

18  Dated:  this 3rd day of July, 2008                Respectfully submitted,

19

20

21                                          By: /s/ Daniel S. Mason
                                                Daniel S. Mason (Cal. Bar No. 54065)
22                                              Zelle, Hofmann, Voelbel, Mason & Gette,
                                                LLP
23                                              44 Montgomery Street, Suite 3400
                                                San Francisco, CA 94104
24                                              Telephone: (415) 693-0700
                                                Email: dmason@zelle.com
25                                              Attorneys for Defendants
                                                CAPETOWN DIAMOND
26                                              CORPORATION, CAPETOWN
                                                LUXURY GROUP, CARL MARCUS,
27                                              AND ROSE MARCUS

28

STITES &
HARBISON, PLLC
ATTORNEYS AT LAW
ATLANTA

CA285:000CA:165868:1:ATLANTA          - 10 -          DEFENDANTS' RESPONSE TO MOTION TO
                                                      QUASH SUBPOENA FOR DEPOSITION OF J.
                                                      THOMAS MCCARTHY 3:08:MC-80125-MMC

**CERTIFICATE OF SERVICE**

I, Robert L. Newman, declare under penalty of perjury that the following is true and correct:

I am a citizen of the United States; am over the age of 18 years; am employed by ZELLE, HOFMANN, VOELBEL, MASON & GETTE LLP, located at 44 Montgomery Street, Suite 3400, San Francisco, California 94104, whose members are members of the State Bar of California and at least one of whose members is a member of the Bar of each Federal District Court within California; am not a party to the within action; and that I caused to be served a true and correct copy of the following documents in the manner indicated below:

1.    DEFENDANTS' RESPONSE TO MOTION TO QUASH SUBPOENA FOR DEPOSITION OF J. THOMAS MCCARTHY; and

2.    CERTIFICATE OF SERVICE.

| | |
|---|---|
| Brian W. Brokate, Esq.<br>Jeffrey Dupler, Esq.<br>GIBNEY, ANTHONY & FLAHERTY, LLP<br>665 Fifth Avenue<br>New York, NY 10022<br>bwbrokate@gibney.com<br>jdupler@gibney.com | Siegrun D. Kane, Esq.<br>Joshua Harris, Esq.<br>MORGAN & FINNEGAN<br>3 World Financial Center<br>New York, NY 10281-2101<br>skane@morganfinnegan.com<br>jharris@morganfinnegan.com |
| Theodore H. Davis, Esq.<br>Constance K. Robinson, Esq.<br>Svetlana S. Gans, Esq.<br>KILPATRICK STOCKTON, LLP<br>1100 Peachtree Street, Suite 2800<br>Atlanta, Georgia  30309<br>tdavis@kilpatrickstockton.com<br>crobinson@kilpatrickstockton.com<br>sgans@kilpatrick.com | Donald R. Andersen<br>Catherine M. Banich<br>STITES & HARBISON, PLLC<br>303 Peachtree Street, NE<br>2800 SunTrust Plaza<br>Atlanta, GA 30308<br>dandersen@stites.com<br>cbanich@stites.com |
| Joseph W. Price, Jr.<br>SNELL & WILMER, LLP<br>1920 Main Street, Suite 1200<br>Irvine, California  92614-7060<br>jprice@swlaw.com | D. Peter Harvey<br>Matthew A. Stratton<br>HARVEY SISKIND, LLP<br>Four Embarcadero Center, 39th Floor<br>San Francisco, CA 94111<br>pharvey@harveysiskind.com<br>mstratton@harveysiskind.com |

☑  **By Electronic Filing**:  I served on this date a true copy of each document listed above via the Court's ECF system on all parties registered for electronic filing and service in this action.

☑  **By U.S. Mail**:  I caused on this date a true copy of each document listed above to be served via U.S. Mail, postage prepaid, on all parties not registered for electronic filing and service in this action.

Dated: this 3rd day of July, 2008

By: _/s/ Robert L. Newman_____
Robert L. Newman
Paralegal

STITES &<br>HARBISON, PLLC<br>ATTORNEYS AT LAW<br>ATLANTA

CA285:000CA:165868:1:ATLANTA                           - 11 -                    DEFENDANTS' RESPONSE TO MOTION TO<br>QUASH SUBPOENA FOR DEPOSITION OF J.<br>THOMAS MCCARTHY 3:08:MC-80125-MMC

# Exhibit A

(Declaration of Donald R. Andersen)

1   Zelle, Hofmann, Voelbel, Mason & Gette, LLP
    Daniel S. Mason
2   California Bar No. 54065
    44 Montgomery Street, Suite 3400
3   San Francisco, CA 94104
    Telephone: (415) 693-0700
4   Facsimile: (415) 415-693-0770
    Email: dmason@zelle.com

5
    Attorneys for Defendants
6   CAPETOWN DIAMOND CORPORATION,
    CAPETOWN LUXURY GROUP, CARL
7   MARCUS, AND ROSE MARCUS

8                  UNITED STATES DISTRICT COURT

9                 NORTHERN DISTRICT OF CALIFORNIA

10

11  ROLEX WATCH U.S.A., INC.,                 Case No. 3:08:MC-80125 (underlying action
                                              pending in the U.S. District Court for the N.
12              Plaintiff,                     District of Georgia, Case No. 1:03-CV-3001-
                                              CC)
13  v.
                                              **DECLARATION OF DONALD R.**
14  CAPETOWN DIAMOND                          **ANDERSEN IN SUPPORT OF**
    CORPORATION, CAPETOWN                     **DEFENDANTS' RESPONSE TO MOTION**
15  LUXURY GROUP, CARL MARCUS, and            **TO QUASH SUBPOENA FOR**
    ROSE MARCUS,                              **DEPOSITION OF J. THOMAS**
16                                            **MCCARTHY**

                Defendants.
17

18                  **DECLARATION OF DONALD R. ANDERSEN**

19      I, Donald R. Andersen, declare and state as follows:

20                                  1.

21      I am a partner at the law firm of Stites & Harbison, PLLC. I have personal knowledge of

22  the following facts, and if called as a witness, I could and would testify competently thereto.

23                                  2.

24      My firm serves as counsel for Capetown Diamond Corporation, Capetown Luxury Group,

25  Carl Marcus, and Rose Marcus ("Defendants"), Defendants in *Rolex Watch U.S.A., Inc. v.*

26  *Capetown Diamond Corp., et al.* Civil Case No. 1:03-CV-3001-CC, pending in the United States

27  District Court for the Northern District of Georgia.

28

STITES &         CA285:000CA:166733:2:ATLANTA                    DECLARATION OF DONALD ANDERSEN
HARBISON, PLLC                                                       IN SUPPORT OF DEFENDANTS'
ATTORNEYS AT LAW                                                    RESPONSE TO MOTION TO QUASH
ATLANTA

3.

The attached Exhibits A and B are referenced in the Memorandum of Points and Authorities in Support of Response to Motion to Quash Subpoena *Duces Tecum* served on Non-Party J. Thomas McCarthy, filed jointly by Rolex and Professor McCarthy.

4.

Exhibit A is a true and correct copy of the 1990 Settlement Agreement and Consent Judgment, which is referenced in the Memorandum of Points and Authorities in Support of Response to Motion to Quash Subpoena *Duces Tecum* served on Non-Party J. Thomas McCarthy, filed jointly by Rolex and Professor McCarthy.

5.

Exhibit B is a true and correct copy of the transcript of the testimony of J. Thomas McCarthy in the matter of Rolex Watch U.S.A., Inc. v. Michel Co., et al., U.S. District Court for the Southern District of California, Civil Case No. 96-0805-H (CM).

6.

Exhibit C is a true and correct copy of excerpts of the testimony of J. Thomas McCarthy in the matter of Rolex Watch U.S.A., Inc. v. Robert Meece, U.S. District Court for the Northern District of Texas, Civil Case No. 3:95-CV-1058(T).

Donald R. Andersen

STITES &
HARBISON, PLLC
ATTORNEYS AT LAW
ATLANTA

CA285:000CA:166733:2:ATLANTA          - 2 -          DECLARATION OF DONALD ANDERSEN
IN SUPPORT OF DEFENDANTS' RESPONSE
TO MOTION TO QUASH 3:08:MC:80125

Declaration of Donald R. Andersen

# Exhibit A

(1990 Settlement Agreement and Consent Judgment)

## SETTLEMENT AGREEMENT

This instrument is made and entered into between ROLEX
WATCH U.S.A., INC., (hereinafter "ROLEX") on the one hand, and
Roger Grafstein & Co., a California corporation, and Carl Marcus,
an individual (hereinafter collectively "Defendants") on the
other hand.  The term "Party," as used herein, shall refer to
ROLEX or the Defendants; "Parties" shall mean ROLEX and the
Defendants.  "This Agreement" refers to the present Settlement
Agreement, of which this definition is a part.  The term "Court"
refers to the United States District Court for the Central
District of California.

The parties to this Agreement, in consideration of the
terms and covenants set forth below, agree as follows:

1.    Defendants agree to enter into a Consent Judgment
and Permanent Injunction between Plaintiff and Defendants (the
"Consent Judgment") in the civil litigation matter captioned
ROLEX WATCH U.S.A., INC. v. Roger Grafstein & Co., et al., Civil
Action No. 90-3185 RB (GHKx), containing a permanent injunction,
and other terms as set forth in Exhibit "A" hereto.

2.    Defendants agree that Defendants will not in the
future be involved in any transactions, discussions or nego-
tiations in violation of the terms of the Consent Judgment and
that Defendants and Defendants' agents, servants, employees and
any persons acting in concert with any of them will abide by each

C:\WP\ROLEX\GRAFSTEI\SA
07/19/90.5  npr/2544

and every term and condition of this Agreement and of the Consent Judgment referred to in Paragraph 1 hereof.

3. Defendants agree that in addition to any other remedies ROLEX might have as a result of the breach of this Agreement, that a breach of any term, condition or obligation of this Agreement or the Consent Judgment by Defendant will allow ROLEX to proceed against Defendants in the present action or in a subsequent action. The Release given by ROLEX in Paragraph 5 hereof does not apply to any future breaches of the Agreement. In such proceedings ROLEX shall be entitled to seek recovery of all available monetary and injunctive remedies for breach of this Agreement, trademark infringement, trademark counterfeiting, false designation of origin, trademark dilution, and unfair competition. In addition, upon proof of a material breach found by the court at a noticed hearing with Defendants having an opportunity to oppose, Defendants hereby consent to entry of a Permanent Injunction against them permanently enjoining their participation in the purchase, advertising, or sale of any product bearing any Rolex Trademark, even if such product is entirely genuine.

4. Defendants, on behalf of Defendants' agents, employees, personal representatives, assigns, heirs, and attorneys, hereby release, acquit, and forever absolutely discharge ROLEX and its officers, directors, agents, servants, employees, stockholders, insurers and assigns, and all companies

in which ROLEX has an interest or which may have an interest in
ROLEX, and their attorneys, Lyon & Lyon, and Gibney, Anthony &
Flaherty and the partners, associates, employees, agents,
insurers, assigns, investigators and investigative agencies of or
for those attorneys, from any and all actions, causes of action,
claims, debts, liabilities, accounts, demands, damages, causes,
claims for indemnification or contribution or any other thing
whatsoever whether known or unknown, suspected or unsuspected,
certain or speculative, including but not limited to trademark,
unfair competition or antitrust claims and any cause of action
under 15 U.S.C. § 1116(d) on account of or in any way arising out
of the subject matter of the above identified litigation, any
proceedings therein or any investigations directed to the subject
matter thereof, which existed as of the effective date of this
release or which may have come into existence at any time prior
to the effective date of this release or which may in the future
arise out of any acts or omissions of any discharged person at
any time prior to the effective date of this release, said
release being contingent on the ordering by the Court of the
Consent Judgment and Permanent Injunction that is to be signed by
all parties.

     5.   ROLEX, on behalf of its agents, employees,
personal representatives, assigns, heirs, and attorneys, hereby
releases, acquits, and forever absolutely discharges Defendants
and Defendants' officers, directors, agents, servants, employees,

C:\WP\ROLEX\GRAFSTE1\SA
07/19/90.5  npr/2544

3

stockholders, insurers and assigns, and all companies in which
Defendants have an interest or which may have an interest in
Defendants, and Defendants' attorneys, from any and all actions,
causes of action, claims, debts, liabilities, accounts, demands,
damages, causes, claims for indemnification or contribution or
any other thing whatsoever whether known or unknown, suspected or
unsuspected, certain or speculative, including but not limited to
trademark and unfair competition claims on account of or in any
way arising out of the operation of Grafstein and Company and
Carl Marcus' assumption therewith which is the subject matter of
the above identified litigation, any proceedings therein or any
investigations directed to the subject matter thereof, which
existed as of the effective date of this release or which may
have come into existence at any time prior to the effective date
of this release or which may in the future arise out of any acts
or omissions of any discharged person at any time prior to the
effective date of this release, said release being contingent on
the ordering by the Court of the Consent Judgment that is to be
signed by all Parties.

      6.  The Parties acknowledge familiarity with Section
1542 of the Civil Code of the State of California, which provides
as follows:

> A general release does not extend to claims
> which the creditor does not know or suspect
> to exist in his favor at the time of execut-
> ing the release, which if known by him must
> have materially affected his settlement with
> the debtor.

C:\WP\ROLEX\GRAFSTEI\SA
07/19/90.5  npr/2544                    4

The Parties waive and relinquish any right and benefit which the Parties have or may have under Section 1542 to the full extent that the Parties may lawfully waive all such rights and benefits pertaining to the subject matter of this Agreement.

7.    On or before January 1, 1991 Grafstein will relinquish the 1-800-24ROLEX telephone number.  Specific instructions to the telephone company allowing Rolex to obtain the number will be prepared and signed at the time of any settlement agreement.  Grafstein shall be entitled to all referrals from said number until January 1, 1991 from said number.

8.    Grafstein agrees that no reference will be made orally or in any writing stating that Grafstein's advertising or method of operation has in any way been approved by Rolex.

9.    The Plaintiff and its officers, directors, and employees including Rolex salesmen agree not to disclose the specific terms of this Settlement Agreement and related Consent Judgment, except that Plaintiff may make limited disclosure as follows:

a.    To its own directors, officers and employees including Rolex salesmen;

b.    In the process of negotiating or attempting to negotiage a resolution or settlement with a third party where Rolex's trademark rights are involved.

    c.    In response to any court or government agency
            process or government agency request.

    d.    In response to unsolicited inquiries from third
            parties regarding misinformation with respect to
            the terms and conditions of the Consent Judgment
            or this Agreement.

Unless and until such time as a court of competent jurisdiction
has issued a ruling or order, written or otherwise, holding
Defendants or either Defendant in breach or contempt of this
Settlement Agreement or Consent Judgment, or both, or if
Defendants make any public representation of the terms of the
Consent Judgment or the Agreement, the Plaintiff shall in no way
publish, print, distribute, advertise, or disseminate the
specific terms of this Settlement Agreement and related Consent
Judgment to third parties, including but not limited to other
jewelers, whether official Rolex jewelers or not, and the
Watchword. A material breach by Plaintiff of this provision will
allow Defendants to recover any damages proved as a result of
such breach but shall not affect any other provision of this
Agreement.

    10.    The Parties will execute all papers necessary to
implement the provisions of the foregoing paragraphs.

    11.    Each Party to this Settlement Agreement acknowl-
edges that no other Party or any agent or attorney of any other
Party, or any other person, firm, corporation or any other entity

has made any promise, representation or warranty whatsoever, expressed, implied, or statutory, not contained herein, concerning the subject matter hereof, to induce the execution of this instrument, and each signatory hereby acknowledges that he, she or it has not executed this instrument in reliance on any promise, representation or warranty not contained herein.

12.   This instrument shall be binding upon and inure to the benefit of the Parties hereto, and each of them, and each and all of their representatives, officers, directors, shareholders, partners, successors, assigns, employees, and agents.

13.   This instrument shall in all respects be interpreted, enforced and governed by and under the laws of the State of California and the statutes of the United States.

14.   The waiver of any breach of this Agreement by any Party shall not be a waiver of any other subsequent or prior breach.

15.   In the event any Party hereto attempts to set aside or to enforce this Agreement, or brings any actions for its breach, the prevailing Party shall be entitled to all reasonable costs, including, but not limited to, actual attorney's fees.

16.   This Agreement shall be construed without regard to the Party or Parties responsible for the preparation of the same. Any ambiguity or uncertainty existing herein shall not be interpreted or construed against any Party hereto.

17. This Agreement shall become binding on the Parties at the time the last of Defendants and a member of Lyon & Lyon and Gibney, Anthony & Flaherty, attorneys for Rolex, execute it below, which shall be the effective date hereof.

18. This Agreement, consisting of Paragraphs 1 through 17, inclusive, together with Exhibit "A" attached hereto, constitutes the entire agreement of the parties and supersedes all prior or contemporaneous agreements, discussions or representations, oral or written, with respect to the subject matter hereof and each of the Parties hereto states that he, she or it has read each of the paragraphs of this Agreement and that he, she or it understands the same and understands the legal obligations created thereby.

FOR ROLEX WATCH U.S.A., INC.:

LYON & LYON
A Partnership Including
WILLIAM C. STEFFIN
A Professional Corporation
JOHN A. RAFTER, JR.
STEPHEN S. KORNICZKY
611 West Sixth Street, 34th Floor
Los Angeles, California   90017
(213) 489-1600

Dated: 7/19/90

By: _____
William C. Steffin
Attorneys for Plaintiff
ROLEX WATCH U.S.A., INC.

GIBNEY, ANTHONY & FLAHERTY
JOHN F. FLAHERTY
BRIAN W. BROKATE
STEPHEN F. RUFFINO
665 Fifth Avenue
New York, New York  10022
(212) 688-5151

Dated: 7/19/90

By: _____
Brian W. Brokate
Attorneys for Plaintiff,
ROLEX WATCH U.S.A., INC.


ROGER GRAFSTEIN & CO., INC.
1851 East First Street
Suite 715
Santa Ana, CA 92705

Dated: _____

By: _____
Roger Grafstein


ROSALINDA SANTIAGO
c/o Roger Grafstein & Co., Inc.
1851 East First Street
Suite 715
Santa Ana, CA 92705

Dated: 7-19-90

By: _____
Rosalinda Santiago


CARL MARCUS (Doe #1)
c/o Roger Grafstein & Co., Inc.
1851 East First Street
Suite 715
Santa Ana, CA 92705

Dated: 07-19-90

By: _____
Carl Marcus

DATED: 7-19-90

_____
Attorney for Defendants

C:\WP\ROLEX\GRAFSTEI\SA
07/19/90.5  npr/2544

9

STATE OF CALIFORNIA      )

COUNTY OF _Los Angeles_)  ss.

      Before me, the undersigned Notary Public in and for the said County and State, personally appeared _Carl Marcus and Rosalinda Santiago_____, who acknowledged that ~~he/she~~ they signed the attached Settlement Agreement.

      EXECUTED this _19th_____ day of _July_____, 19_90_, at _Los Angeles___, California.



_Nada Pearl Robie_
Notary Public in and for said County and State

Witness my hand and Official Seal.

1  LYON & LYON
   A Partnership Including
2  WILLIAM C. STEFFIN
   A Professional Corporation
3  JOHN A. RAFTER, JR.
   611 West Sixth Street, 34th Floor
4  Los Angeles, California 90017
   (213) 489-1600
5
   GIBNEY, ANTHONY & FLAHERTY
6  JOHN F. FLAHERTY
   BRIAN W. BROKATE
7  665 Fifth Avenue
   New York, New York 10022
8  (212) 688-5151

   Attorneys for Plaintiff
   ROLEX WATCH U.S.A., INC.

**FILED**

**JUL 2 4 1990**

CLERK, U.S. DISTRICT COURT
CENTRAL DISTRICT OF CALIF.
BY

**ENTERED**

11 **JUL 2 5 1990**
12

CLERK U.S. DISTRICT COURT
CENTRAL DISTRICT OF CALIF.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

14 | ROLEX WATCH U.S.A., INC., ) Civil Action No.
15 |              Plaintiff, ) 90-3185 RB (Bx)
16 |     v. )
17 | ROGER GRAFSTEIN & CO., INC., ) CONSENT JUDGMENT AND
   | a California corporation; ) PERMANENT INJUNCTION
18 | CARL MARCUS (Doe #1), and ) BETWEEN PLAINTIFF AND
   | DOES 2-10, ) DEFENDANT
19 | ) 
20 |              Defendants. ) [UNDER SEAL]
                              )
21

22

23          Plaintiff, ROLEX WATCH U.S.A., INC. ("Rolex" or "the

24  Plaintiff") and Defendants Roger Grafstein & Co., Inc. and Carl

25  Marcus (Doe #1) hereinafter jointly referred to as "Defendants" or

26  "Grafstein", in compromise and settlement of this action on the

27  terms and conditions of a Settlement Agreement made between them

28

LYON & LYON
611 WEST SIXTH ST.
LOS ANGELES.
CALIFORNIA 90017
489-1600

C:\WP\ROLEX\GRAFSTEI\CJ
07/19/90.5   hpr/2544

1  having agreed that a Consent Judgment and Permanent Injunction

2  should be entered between them and good cause appearing therefor,

3            IT IS ORDERED, ADJUDGED, AND DECREED:

4        1.    This case arose under the Trademark Act of 1946,

5  15 U.S.C. §§ 1051-1127.  This Court has jurisdiction over each of

6  the parties to this action and over the subject matter thereof

7  pursuant to 15 U.S.C. § 1121, 28 U.S.C. § 1338(a), 28 U.S.C.

8  § 1331, and 28 U.S.C. § 1332.  The amount in controversy exceeds

9  the sum of $10,000, exclusive of interest and costs.  The claims

10 arising under the State dilution and unfair competition statutes,

11 California Business and Professional Code §§ 14330, 17203 and

12 under common law rights are joined with the substantial and

13 related claim under the Trademark Laws of the United States,

14 15 U.S.C. §§ 1051-1127.  Therefore, the Court has jurisdiction

15 over the state unfair competition claims pursuant to 28 U.S.C.

16 § 1338(b).  The Court further has continuing jurisdiction to

17 enforce the terms and provisions of this Consent Judgment and

18 Permanent Injunction.

19

20            **FINDINGS OF FACT AND CONCLUSIONS OF LAW**

21        2.    Plaintiff, Rolex Watch U.S.A., Inc. (Rolex) is a

22 New York corporation having a principal place of business in New

23 York, New York, and Defendant Roger Grafstein & Co., Inc.

24 (Grafstein) is a California corporation having a principal place

25 of business in Santa Ana, California.  Defendant Carl Marcus (Doe

26 #1) is an individual residing and transacting business in this

27 district and has participated with Roger Grafstein & Co., Inc. in

28 the activities to which the Complaint is directed.

LYON & LYON
611 WEST SIXTH ST.
LOS ANGELES.
CALIFORNIA 90017
489-1800

C:\WP\ROLEX\GRAFSTEI\CJ
07/19/90.5   npr/2544                    2

3.    Rolex is the owner of the registered, valid, incontestable and subsisting Trademarks ROLEX, PRESIDENT, and CROWN DEVICE (Exhibits 1, 2, and 3 hereto, referred to collec- tively as The Rolex Trademarks) and is the exclusive distributor of ROLEX watches in the United States.  Rolex distributes ROLEX watches through a network of carefully selected Official Rolex Jewelers, and advertises such ROLEX watches in national publications in connection with the Rolex Trademarks and photographs of ROLEX watches.

4.    The public has come to associate the use of the Rolex Trademarks and depictions of photographs of ROLEX watches with products offered by or under the direction and control of or under the sponsorship or approval of or in association with Rolex.

5.    Grafstein has advertised the availability for sale of new, used and "custom" watches which may have started as ROLEX watches in a variety of advertisements, samples of which are attached to the Complaint as Exhibits D-K.  These advertisements emphasize the Rolex Trademarks, utilize a photograph of a ROLEX watch as a primary feature thereof and compare Grafstein's price of a "custom" watch to Rolex's suggested retail price for a genuine ROLEX Watch.

6.    In connection with the advertising campaign, customers have responded and approached Grafstein to purchase watches.  On at least two occasions customers have purchased watches from Grafstein allegedly believing the used watches to be genuine ROLEX Watches when in fact the watches contained parts originating from Grafstein.

7.    Members of the purchasing public are likely to

LYON & LYON
911 WEST SIXTH ST.
LOS ANGELES,
CALIFORNIA 90017
489-1600

C:\WP\ROLEX\GRAFSTEI\CJ
07/19/90.5  npr/2544

3

1   believe or be confused or be deceived into believing that watches

2   bearing the ROLEX Trademarks which they purchase from Grafstein

3   are in fact completely genuine ROLEX Watches or that Grafstein is

4   sponsored, endorsed or approved by or associated or connected with

5   Rolex.

6        8.   Grafstein is not an Official Rolex Jeweler and is

7   not authorized by Rolex to offer new ROLEX products to the public.

8   Grafstein does not have any other association with Rolex.

9        9.   Members of the purchasing public are likely to

10  believe or be confused or be deceived into believing that

11  Grafstein is an Official Rolex Jeweler or is otherwise sponsored,

12  endorsed or approved by or associated or connected with Rolex.

13       10.  Rolex alleges that Grafstein's advertising and

14  promotion of the ROLEX watches it sells and its sales practices

15  misrepresents the nature, characteristics and qualities of those

16  watches.  Without admitting any wrongdoing, Grafstein acknowledges

17  that certain changes should be made in its advertising and

18  promotion of the ROLEX watches it sells and in its sales

19  practices.

20       11.  Grafstein prominently displays in its advertising

21  the telephone number "800/24ROLEX".  The use of that ROLEX

22  telephone number substantially contributes to the likelihood of

23  confusion and misrepresentations set forth in paragraphs 6, 8, and

24  9.

25       12.  Defendants enter into this Consent Judgment and the

26  related Settlement Agreement without any admission of wrongdoing,

27  but solely for the purposes of settling disputed claims and to

28  avoid the expense and uncertainty of continuing litigation.

LYON & LYON
611 WEST SIXTH ST.
LOS ANGELES.
CALIFORNIA 90017
489-1600

C:\WP\ROLEX\GRAFSTEI\CJ
07/19/90.5   npr/2544

4

## ORDER

IT IS THEREFORE ORDERED, that Defendants Roger Grafstein & Co., Inc., and Carl Marcus, their officers, agents, servants, employees, attorneys and all persons acting for, with or under them or who receive notice of this Order by personal service or otherwise are immediately and permanently enjoined and restrained from:

1.  Selling, advertising, or offering for sale any ROLEX watches or watch parts bearing any Rolex Trademark except in compliance with this Injunction. The acts prohibited include, but are not limited to, the following:

    a)  Using the Rolex Trademarks or any colorable imitation of said marks in any manner likely to cause confusion, to cause mistake or to deceive;

    b)  Committing any acts calculated to cause purchasers to believe that Grafstein's products are one hundred percent genuine ROLEX products unless they are entirely such;

    c)  The sale or offering for sale of ROLEX watches or ROLEX watch parts that are not one hundred percent genuine ROLEX watches or watch parts unless said sale or offering for sale is accompanied by a full and adequate disclosure informing the consumer that the watch contains non-genuine ROLEX parts. Invoices are to clearly identify and list each non genuine ROLEX part included in the watch, bracelet or part, as such. In addition, customers must be

LYON & LYON
611 WEST SIXTH ST.
LOS ANGELES.
CALIFORNIA 90017
489.1600

C:\WP\ROLEX\GRAFSTEI\CJ
07/19/90.5  npr/2544

5

1   informed that addition of non-genuine ROLEX parts

2   may void the Rolex warranty, if any exists, and

3   that Grafstein provides its own warranty.  Sale of

4   watches or watch parts including non-genuine ROLEX

5   parts is not prohibited by this Order so long as

6   the disclosures set forth in this Consent Judgment

7   are provided to the consumer.

8   d)   The sale or offering for sale of used ROLEX watches

9   or watch parts as new.

10  e)   For purposes of this Consent Judgment and the

11  accompanying Settlement Agreement, the term "non-

12  genuine" used to describe watches or watch parts

13  shall be deemed to refer to watches or watch parts

14  which were originally entirely genuine ROLEX

15  watches or watch parts in which non-ROLEX parts

16  such as refinished dials, bezels, clasps, diamonds

17  and bracelet links have been substituted or added.

18  In no event does any exception applied to non-

19  genuine watches or watch parts authorize the sale

20  of a watch or watch part bearing the Rolex

21  Trademarks which was not originally a one hundred

22  percent genuine ROLEX product legitimately bearing

23  the Rolex trademark.

24  2.   using any and all trademarks of Plaintiff, including

25  without limitation the Rolex Trademarks, or any word or

26  mark confusingly similar thereto (collectively the

27  "Restricted Marks"), in promotional material,

28  advertisements, signs, point of sale displays, or

LYON & LYON
611 WEST SIXTH ST.
LOS ANGELES,
CALIFORNIA 90017
489-1600

C:\WP\ROLEX\GRAFSTEI\CJ
07/19/90.5   npr/2544

6

otherwise, in a manner which is likely to cause confusion, deception or mistake to the effect, or in such manner as to imply, that Defendants are an Official Rolex Jeweler or are an authorized dealer, agent, distributor or representative of Plaintiff or are in any way connected with, affiliated with, approved by or endorsed by Plaintiff.  The acts prohibited include but are not limited to, the following:

a)    using the Restricted Marks in advertisements and other promotional material unless the name GRAFSTEIN & CO., or any name or any business in which Carl Marcus engages or any other reference to the sponsoring advertiser, is prominent and conspicuous in comparison to the Restricted Marks or any depiction of a ROLEX Watch.  With respect to advertisements, other than in brochures, which depict a ROLEX Watch, the GRAFSTEIN or other sponsor name must be used at least twice in proximity to the picture and in type no less than 1/4 the size of the watch depiction (measured in vertical linear inches -- combined total for all watches depicted).  At least one use of the GRAFSTEIN or other sponsor name must be no less prominent than in the attached Exhibit 4 hereto which also illustrates the minimum relative watch picture to type size relationship and proximity.

b)    utilizing, advertising or promoting the 800/24ROLE telephone number in any manner inconsistent with

LYON & LYON
811 WEST SIXTH ST.
LOS ANGELES.
CALIFORNIA. 90017
489-1800

C:\WP\ROLEX\GRAFSTEI\CJ
07/19/90.5   npr/2544

7

Paragraph 3 f) below;

c)   utilizing, advertising or promoting the 800-247-6539 telephone number in any manner inconsistent with Paragraph 3 f) below;

d)   advertising or promoting any comparison between a "retail" price of a genuine ROLEX watch with Defendants' price of a used, modified or "custom" ROLEX watch in any manner inconsistent with any subparagraph of Paragraph 3 below; and

e)   using advertising, words or actions tending to suggest to the public that Defendant provides authorized service on ROLEX watches.

3.   The parties have agreed that the restrictions of the Injunction specifically include the prohibitions and restrictions set forth below.

a)   In print advertising referring to any ROLEX watch:

(1)   There will be no price comparisons unless the comparison is between a new fully genuine ROLEX watch offered by Grafstein, and Rolex's suggested retail price for the same model.

(2)   Any use of a picture of a ROLEX watch in advertising must be no more prominent than any other portion of the ad and the Rolex Trademarks must not be enhanced or enlarged.

(3)   Yellow Page or White Page telephone book advertising which identifies Grafstein as a "Rolex authorized repair service" or the like or which prominently displaying the Rolex

LYON & LYON
611 WEST SIXTH ST.
LOS ANGELES.
CALIFORNIA 90017
489.1600

C:\WP\ROLEX\GRAFSTEI\CJ
07/19/90.5   npr/2544

8

1    Trademarks must be cancelled forthwith.

2    (4)   If a picture of a ROLEX watch is used or if

3          Rolex watches are advertised exclusively in

4          the advertisement, the disclaimer, "Not an

5          Official Rolex Jeweler" must be included.

6    b)   With respect to Brochure advertising, including

7         mailers, all of the restrictions for print

8         advertising shall apply unless modified in this

9         Consent Judgment with respect to brochures only.

10        In addition, any reference to a ROLEX watch or the

11        Rolex Trademarks in a brochure must also include

12        the disclaimer, "Not an Official Rolex Jeweler" an

13        a disclosure that the Rolex Warranty may be voided

14   c)   With respect to Point of Sale material:

15        (1)   Any reference to ROLEX on the office door,

16              building register or external signs must be

17              removed forthwith and not used at any time in

18              the future.

19        (2)   If any point of sale advertising is used, at

20              any location, it must  originate with

21              Grafstein and not be point of sale material

22              prepared for or by Official Rolex Jewelers.

23              There must also be an equally prominent poin

24              of sale display disclosing that Grafstein is

25              not an Official Rolex Jeweler.

26        (3)   Neither the Rolex Trademarks nor a picture c

27              a ROLEX watch will be used on any Grafstein

28              business card.

LYON & LYON
911 WEST SIXTH ST.
LOS ANGELES,
CALIFORNIA 90017
489-1600

C:\WP\ROLEX\GRAFSTEI\CJ
07/19/90.5   npr/2544

9

1    business card.

2    (4)    Price comparison can be made in a brochure so

3    long as comparison between a new fully genuine

4    ROLEX watch offered by Grafstein, used ROLEX

5    watch and any ROLEX watch including non-

6    genuine ROLEX parts is made with full and

7    adequate disclosure (e.g., new vs. used, new

8    vs. non-genuine, used vs. non-genuine).

9    d)    References to non-genuine ROLEX watches.

10    (1)    Any reference whether in print advertising,

11    brochures, or point of sale material which

12    includes a reference to a watch which is not a

13    100% genuine ROLEX watch must include an

14    equally prominent disclaimer that non-genuine

15    Rolex parts have been added or substituted.

16    The use of the term "custom" or "aftermarket"

17    alone is not acceptable for this disclaimer.

18    e)    Disclosures during sales and presentations.

19    (1)    Any sale involving a watch which does not

20    include 100% genuine Rolex parts must be

21    accompanied by an invoice presented to the

22    customer at the time of sale specifically

23    disclosing which parts are not genuine ROLEX

24    parts.

25    (2)    All sales of any watch bearing a Rolex

26    Trademark must be accompanied by a written

27    disclosure that the Rolex warranty may be

28    voided.

LYON & LYON
811 WEST SIXTH ST.
LOS ANGELES,
CALIFORNIA 90017
489-1800

C:\WP\ROLEX\GRAFSTEI\CJ
07/19/90.5   npr/2544

10

f)  The 1-800-24ROLEX Telephone Number.

    (1)  Grafstein will immediately discontinue all advertisements utilizing the 1-800-24ROLEX number.  Any advertisements, such as newspaper advertisements which can be changed will be changed.

    (2)  Grafstein will not adopt a telephone number, including 800 telephone numbers, which includes the numeric sequence 76539 whether or not separated by other numbers.

    (3)  Grafstein shall be entitled to all referrals from the 1-800-247-6539 telephone number until January 1, 1991.

g)  Future advertising will not contain any reference to factory authorized service or factory specifications or restoration to factory new condition or the like.  No reference will be made to repairs performed by "Swiss or European or Rolex trained" repair persons unless the same is documented to be true on a current basis.

h)  No reference in any advertising or oral sales presentation will be made which in any way falsely disparages any Rolex product, sales, or service.

i)  To insure compliance with this Consent Judgment, Rolex may have agents or investigators contact Grafstein without prior notice by telephone or in person, and determine the statements and representations made by Grafstein in connection

LYON & LYON
611 WEST SIXTH ST.
LOS ANGELES.
CALIFORNIA 90017
489-1600

C:\WP\ROLEX\GRAFSTEI\CJ
07/19/90.5  npr/2544

11

1    with the sale or offer for sale of watches.

2    4.    otherwise infringing the Restricted Marks;

3    5.    unfairly competing with Plaintiff in any manner which

4          violates the law; and

5    6.    causing a likelihood of confusion with injury to the

6          business reputation of Plaintiff, or dilution of the

7          distinctiveness of the Restricted Marks.

8

9    Defendants have agreed to and it is FURTHER ORDERED

10   that, Defendants and each of them shall comply with all of the

11   terms of this Consent Judgment And Permanent Injunction and the

12   Settlement Agreement between them.   Failure to do so shall subject

13   Defendants to contempt proceedings and to any penalty or procedure

14   set forth in the Settlement Agreement.

15   IT IS FURTHER ORDERED that, in order to insure

16   compliance with paragraph 2 of this Order, Defendants shall take

17   all steps necessary to ensure that no further publication occurs

18   of advertisements, brochures, point of sale materials, and the

19   like which violate the prohibitions of paragraphs 2 and 3 of this

20   Order (including but not limited to those exhibited to the

21   Complaint).   Defendants shall document, in writing, all steps

22   taken to comply with the preceding sentence and submit the same t

23   the Court and Plaintiff's attorneys in a report signed under the

24   penalty of perjury and submitted within thirty (30) days from the

25   date this Order is entered.

26   IT IS FURTHER ORDERED that service by mail of a copy of

27   this Consent Judgment And Permanent Injunction addressed to

28   Defendants Roger Grafstein & Co., Inc. and Carl Marcus at 1851

LYON & LYON
611 WEST SIXTH ST.
LOS ANGELES,
CALIFORNIA 90017
489-1600

C:\WP\ROLEX\GRAFSTEI\CJ
07/19/90.5   npr/2544

12

1  East First Street, Suite 715, Santa Ana, California 92705 shall be

2  deemed sufficient notice under Rule 65, Federal Rules of Civil

3  Procedure.  It shall not be necessary for Plaintiff to obtain a

4  receipt of the mail service.

5      The Court shall have continuing jurisdiction to enforce

6  this Consent Judgment And Permanent Injunction.

7      The Plaintiff and the Defendants, as between themselves,

8  shall each bear their own costs and attorney's fees.

9      The Court orders that the unserved Doe Defendants (Does

10 2-10) are dismissed without prejudice.

11

12     DATED this _24_ day of _July_, 1990.

13                    ROBERT C. BONNER

14                    UNITED STATES DISTRICT JUDGE

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LYON & LYON
611 WEST SIXTH ST.
LOS ANGELES.
CALIFORNIA 90017
489-1600

C:\WP\ROLEX\GRAFSTEI\CJ
07/19/90.5   npr/2544

13

1   Approved as to Form and Content:

2   LYON & LYON
    A Partnership Including
3   WILLIAM C. STEFFIN
    A Professional Corporation
4   JOHN A. RAFTER, JR.
    611 West Sixth Street, 34th Floor
5   Los Angeles, California  90017
    (213) 489-1600
6
7   By:  _____
         WILLIAM C. STEFFIN
8        JOHN A. RAFTER, JR.
         Attorneys for Plaintiff
9        ROLEX WATCH U.S.A., INC.

10

11  GIBNEY, ANTHONY & FLAHERTY
    JOHN F. FLAHERTY
12  BRIAN W. BROKATE
    STEPHEN F. RUFFINO
13  665 Fifth Avenue
    New York, New York  10022
14  (212) 688-5151

15

16  By:  _____
         Brian W. Brokate
17       Attorneys for Plaintiff,
         ROLEX WATCH U.S.A., INC.

18

19

20

21

22

23

24

25

26

27

28

LYON & LYON
611 WEST SIXTH ST.
LOS ANGELES,
CALIFORNIA 90017
489-1600

C:\WP\ROLEX\GRAFSTEI\CJ
07/19/90.5   nor/2544

14

1  DAVID A. McDONNELL
   One City Boulevard West
2  Suite 407
   Orange, CA 92668
3  (714) 938-1010

4  By: _David A. McDonnell_
5      David A. McDonnell
       Attorneys for Defendants
6      Roger Grafstein & Co., Inc.
       Carl Marcus (Doe #1)

7

8  ROGER GRAFSTEIN & CO., INC.
9  1851 East First Street
   Suite 715
10 Santa Ana, CA 92705

11

   By: _____
12     Roger Grafstein

13

14 ROSALINDA SANTIAGO
   President
15 Roger Grafstein & Co., Inc.
   1851 East First Street
16 Suite 715
   Santa Ana, CA 92705

17

18 By: _Rosalinda Santiago_____
19     Rosalinda Santiago

20

21 CARL MARCUS (Doe #1)
   c/o Roger Grafstein & Co., Inc.
22 1851 East First Street
   Suite 715
23 Santa Ana, CA 92705

24 By: _____
25     Carl Marcus

26

27

28

YON & LYON
WEST SIXTH ST.
LOS ANGELES.
CALIFORNIA 90017
489-1600

C:\WP\ROLEX\GRAFSTEI\CJ
07/19/90.5  npr/2544

15

**EXHIBIT 1**

PUBLISHED

Under Sec. 12 (c) 1946 Act

APR 19 1955

SECOND RENEW

MANUFACTURE OF ROLEX WATCHES,
AEGLER LIMITED
BIENNE, SWITZERLAND

101,819. WATCHES, CLOCKS, PARTS OF WATCHES
AND CLOCKS, AND THEIR CASES, Registered Jan.
May 12, 1918. Aegler S. A., Registered Jan.
1915, to Aegler, S. A., Brevets January 12
Grun Guild, A. Bienne, Switzerland, a corporation of
Switzerland, by change of name

AFFIDAVIT SEC. 8
ACCEPTED

AFFIDAVIT SEC. 15
RENEWED 2-9-61

Renewed for 3rd time for 20 years from January 12, 1975

# UNITED STATES PATENT OFFICE.

AEGLER S. A., OF BIENNE, SWITZERLAND.

TRADE-MARK FOR WATCHES, CLOCKS, PARTS OF WATCHES AND CLOCKS, AND THEIR CASES.

101,819.

Registered Jan. 12, 1915.

Application filed June 8, 1914. Serial No. 73,901.

## STATEMENT.

*To all whom it may concern:*

Be it known that AEGLER S. A., a company registered in Switzerland under Swiss law, and located in Bienne, Switzerland, doing business at Rebberg Works, Hoheweg 82 and 82ᵃ, Bienne, Switzerland, has adopted and used the trade-mark shown in the accompanying drawing, for watches, clocks, parts of watches and clocks, and their cases, in Class 27, Horological instruments.

The trade mark has been continuously used in the business of the said company since the year 1912.

The trade mark is applied or affixed to the goods or to the packages containing same by placing thereon a printed label on which the trade mark is shown; it is also stamped directly on the goods.

AEGLER S. A.
HERMAN AEGLER,
*Director.*

# ROLEX

## DECLARATION.

Confederation of Switzerland. Canton and city of Berne ss.

HERMAN AEGLER, being duly sworn deposes and says that he is the director of the company, the applicant named in the foregoing statement; that he believes the foregoing statement is true; that he believes the said company is the owner of the trade mark sought to be registered; that no other person, firm, corporation or association, to the best of his knowledge and belief, has the right to use said trade mark in the United States, either in the identical form or in any such near resemblance thereto as

might be calculated to deceive; (that said trade mark has been registered in Switzerland on the 7th October 1913 No. 34251); that the description and drawing presented truly represent the trade mark sought to be registered; and that the facsimiles show the trade mark as actually used upon the goods.

HERMAN AEGLER.

Subscribed and sworn to before me this 20th day of May, 1914.

[L.S.]            GEO. HEIBROD,
*Consul of the United States of America at Berne, Switzerland.*

Copies of this trade-mark may be obtained for five cents each, by addressing the "Commissioner of Patents, Washington, D. C."

CERTIFIED TO BE A TRUE COPY OF THE REGISTRATION WHICH IS IN FULL FORCE AND EFFECT, WITH NOTATION OF ALL STATUTORY ACTIONS TAKEN THEREON, AS DISCLOSED BY THE RECORDS OF THE UNITED STATES PATENT AND TRADEMARK OFFICE. SAID RECORDS SHOW TITLE TO BE IN: Rolex Watch U.S.A. Inc., a NY corp

ATTEST

OCT 14 1988

ATTESTING OFFICER

COMMISSIONER OF PATENTS
AND TRADEMARKS

EXHIBIT 1
-16-

**EXHIBIT 2**

Registered Jan. 24, 1950

**Registration No. 520,309**

AFFIDAVIT SEC. 8
ACCEPTED

**PRINCIPAL REGISTER**

**Trade-Mark**

RENEWED

*Diershoff N.Y.*

Renewed for 20 years from    Jan. 24, 1970

# UNITED STATES PATENT OFFICE

Bulova Watch Company, Inc., New York, N.Y.

Act of 1946

Application February 10, 1949, Serial No. 573,440

# President

**(Statement)**

Bulova Watch Company, Inc., a corporation duly organized under the laws of the State of New York, located and doing business at No. 630 Fifth Avenue, in the city of New York, State of New York, United States of America, has adopted and is using the trade-mark shown in the accompanying drawing, for WRISTBANDS AND BRACELETS FOR WATCHES MADE WHOLLY OR IN PART OR PLATED WITH PRECIOUS METALS, SOLD SEPARATELY FROM WATCHES, in Class 28, Jewelry and precious-metal ware, and presents herewith five specimens showing the trade-mark as actually used in connection with such goods, the trade-mark being applied to tag-labels affixed to the goods, and requests that the same be registered in the United States Patent Office on the Principal Register in accordance with the act of July 5, 1946.

The trade-mark was first used on January 5, 1949, and first used in commerce among the several States of the United States which may lawfully be regulated by Congress, on January 5, 1949.

Applicant is the owner of United States Trade-Mark Registration No. 222,234, registered January 26, 1927, renewed.

**(Declaration)**

Harry D. Henshel, being duly sworn, deposes and says that he is vice president of Bulova Watch Company, Inc., the applicant named in the foregoing statement, that he believes that said corporation is the owner of the trade-mark which is in use in commerce among the several States of the United States, and that no other person, firm, corporation or association, to the best of his knowledge and belief, has the right to use such trade-mark in commerce which may lawfully be regulated by Congress either in the identical form thereof or in such near resemblance thereto as might be calculated to deceive; that the drawing and description truly represent the trade-mark sought to be registered, that the specimens show the trade-mark as actually used in connection with the goods, and that the facts set forth in the statement are true.

BULOVA WATCH COMPANY, INC.,
By HARRY D. HENSHEL,
Vice President.



CERTIFIED TO BE A TRUE COPY OF THE REGISTRATION WHICH IS IN FULL FORCE AND EFFECT, WITH NOTATION OF ALL STATUTORY ACTIONS TAKEN THEREON, AS DISCLOSED BY THE RECORDS OF THE UNITED STATES PATENT AND TRADEMARK OFFICE.   SAID RECORDS SHOW TITLE TO BE IN:   Rolex Watch U.S.A., Inc.,
a corp. of NY

Attest

JAN 4   1989

Attesting Officer

COMMISSIONER OF PATENTS
AND TRADEMARKS

EXHIBIT 2

**EXHIBIT 3**

# United States Patent Office

**657,756**

Registered Jan. 28, 1958

**AFFIDAVIT SEC. 8 ACCEPTED**

**PRINCIPAL REGISTER**
**Trademark**

**AFFIDAVIT SEC. 15 RECEIVED 3-11-63**

Ser. No. 27,565, filed Apr. 3, 1957



Montre Rolex S. A. (Rolex Uhren Ag.), (Rolex Watch Co. Ltd.), (Swiss corporation)
18, rue du Marché
Geneva, Switzerland

For: TIMEPIECES OF ALL KINDS AND PARTS THEREOF, in CLASS 27.
First use Jan. 15, 1941; in commerce June 1, 1941.

Renewed for 20 years from Jan. 28, 1978



CERTIFIED TO BE A TRUE COPY OF THE REGISTRATION WHICH IS IN FULL FORCE AND EFFECT, WITH NOTATION OF ALL STATUTORY ACTIONS TAKEN THEREON, AS DISCLOSED BY THE RECORDS OF THE UNITED STATES PATENT AND TRADEMARK OFFICE. SAID RECORDS SHOW TITLE TO BE IN: Rolex Watch, U.S.A., Inc., a NY corp.

Attest

JAN 7 1986

Attesting Officer

COMMISSIONER OF PATENTS AND TRADEMARKS

EXHIBIT 3
-18-

**EXHIBIT 4**

**A6**  THE WALL STREET JOURNAL TUESDAY, DECEMBER 12, 1989

# "I was in the market for a NEW watch until I called GRAFSTEIN."

**W**alter Strow, captain with a major American airline, could easily afford a new watch, but he, as thousands before him, opted for the wiser choice...PRE-OWNED!

*Switzerland's best kept secret is the fact that most great watches are made to last forever.* GRAFSTEIN's European trained craftsmen meticulously restore classic, vintage, and contemporary timepieces to factory specifications. All are guaranteed, including parts and labor. Current models carry the exclusive GRAFSTEIN lifetime warranty.





We offer America's largest inventory of choice pre-owned watches including Rolex, Cartier, Patek-Philippe, etc. at prices starting as low as $400.

Gents Rolex SS-Gold Datejust
Retail $3,650  GRAFSTEIN from $1,790

*Call today for complimentary shop-at-home brochure or showroom appt.*

## GRAFSTEIN & CO.
Wholesalers to the Trade Since 1939
714/835-6100  800/24ROLEX
Santa Ana ● Beverly Hills ● New York

EXHIBIT 4
-19-

## VERIFICATION

STATE OF CALIFORNIA, COUNTY OF

I have read the foregoing _____

_____ and know its contents.

### ☒ CHECK APPLICABLE PARAGRAPH

☐ I am a party to this action. The matters stated in the foregoing document are true of my own knowledge except as to those matters which are stated on information and belief, and as to those matters I believe them to be true.

☐ I am ☐ an Officer ☐ a partner_____ ☐ a _____ of_____

a party to this action, and am authorized to make this verification for and on its behalf, and I make this verification for that reason. ☐ I am informed and believe and on that ground allege that the matters stated in the foregoing document are true. ☐ The matters stated in the foregoing document are true of my own knowledge except as to those matters which are stated on information and belief, and as to those matters I believe them to be true.

☐ I am one of the attorneys for _____.

a party to this action. Such party is absent from the county of aforesaid where such attorneys have their offices, and I make this verification for and on behalf of that party for that reason. I am informed and believe and on that ground allege that the matters stated in the foregoing document are true.

Executed on_____, 19_____, at_____, California.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

_____              _____
Type or Print Name                                          Signature

### PROOF OF SERVICE
1013A (3) CCP Revised 3/88

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I am employed in the county of_____ Los Angeles _____, State of California.

I am over the age of 18 and not a party to the within action; my business address is: ___ LYON & LYON ___

611 W. Sixth Street, 34th Floor, Los Angeles, CA 90017

On July 20, 19 90 I served the foregoing document described as
~~CONSENT JUDGMENT AND PERMANENT INJUNCTION BETWEEN PLAINTIFF AND DEFENDANT~~
~~[UNDER SEAL]    ("Lodged" 7/20/90)~~
_____ on ___ Defendant _____ in this action

☐ by placing the true copies thereof enclosed in sealed envelopes addressed as stated on the attached mailing list:
☒ by placing ☐ the original ☒ a true copy thereof enclosed in sealed envelopes addressed as follows:

David A. McDonnell, Esq.                    Mr. Carl Marcus
One City Boulevard West                     1851 East First Street
Suite 407                                   Suite 715
Orange, CA 92668                            Santa Ana, CA 92705

☒ BY MAIL
☒ *I deposited such envelope in the mail at ___ Los Angeles _____, California.
The envelope was mailed with postage thereon fully prepaid.

I am "readily familiar" with firm's practice of collection and processing correspondence for mailing. It is deposited with U.S. postal service on that same day in the ordinary course of business. I am aware that on motion of party served, service is presumed invalid if postal cancellation date or postage meter date is more than 1 day after date of deposit for mailing in affidavit.

Executed on July 20, _____, 1990, at Los Angeles _____, California.

☐ **(BY PERSONAL SERVICE) I delivered such envelope by hand to the offices of the addressee.

Executed on_____, 19____, at_____, California.

☐ (State)    I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

☒ (Federal)  I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

_____              _____
Type or Print Name                                          Signature

STUART'S ESBROOK TIMESAVER 1REVISED   3/88 ·
NEW DISCOVERY LAW 2030 AND 2031 CCP
May be used in California State or Federal Courts

*BY MAIL SIGNATURE MUST BE OF PERSON DEPOSITING ENVELOPE IN MAIL SLOT BOX OR BAG.
**FOR PERSONAL SERVICE SIGNATURE MUST BE THAT OF MESSENGER

Declaration of Donald R. Andersen

# Exhibit B

(a true and correct copy of the transcript of the testimony of J. Thomas McCarthy in the matter of *Rolex Watch U.S.A., Inc. v. Michel Co., et al.*, U.S. District Court for the Southern District of California Civil Case No. 96-0805-H (CM))

1

2

3    UNITED STATES DISTRICT COURT

    SOUTHERN DISTRICT OF CALIFORNIA

4  ROLEX WATCH, U.S.A., INC.,   )   Case No. 96-0805-H(CM)
                                    )
5         Plaintiff,     )   San Diego, California
                                    )
6  vs.                              )   Thursday,
                                    )   December 12, 1996
7  MICHEL CO., et al.,              )   9:00 a.m.
                                    )
8         Defendants.    )   VOLUME III

9

                        TRANSCRIPT OF TRIAL
10          BEFORE THE HONORABLE MARILYN L. HUFF
                UNITED STATES DISTRICT JUDGE
11

APPEARANCES:
12
For the Plaintiff:              JOHN SUMNER, ESQ.
13
                                BRIAN BROKATE, ESQ.
14
                                BETH FRENCHMAN, ESQ.
15
                                DAVID KANE, ESQ.
16
                                SIEGRUN KANE, ESQ.
17
For the Defendant:              JANICE BROWN, ESQ.
18
                                CHARLES GOLDBERG, ESQ.
19
                                LAURA ROPPE, ESQ.
20
Transcript ordered by:          JOSEPH SULLIVAN, ESQ.
21
Court Recorder:                 Nancy Cablay
22                              United States District Court
                                940 Front Street
23                              San Diego, California  92189

24
Proceedings recorded by electronic sound recording;
25  transcript produced by transcription service.

McCARTHY - DIRECT

IV-17

1    that case, post-purchase confusion of those who see other

2    people wearing non-genuine Levi Strauss pants with the tab

3    on the seat of the pants was found to be an element of the

4    kind of likelihood of confusion that occurs in these

5    cases.

6    Q    Even though it's after the point of sale.

7    A    That's correct.

8         (Pause.)

9    Q    I would like to ask you now about Defendants' sale of

10   non-Rolex replacement parts separately -- that is, not

11   mounted on watches, individual bezels or dials of

12   bracelets.

13        The assumptions here are the following:  Defendants

14   sell non-Rolex bezels, dials and bracelets made to fit

15   Rolex watches.  Rolex replacement parts do not fit other

16   watches without adjustment.  Defendants' non-original,

17   non-Rolex parts do not bear any markings to indicate their

18   source.  Defendants' non-Rolex parts use diamonds inferior

19   in quality to Rolex diamonds, and Rolex itself does sell

20   genuine replacement parts for each of these -- in each of

21   these categories.

22        My question is this:  Based on these assumptions,

23   what does Plaintiff need to show to establish Defendants'

24   liability for infringement?

25   A    In that circumstance, if the Defendant knows or has

McCARTHY - DIRECT                                   IV-18

1    reason to know that it is selling to people who are using

2    these parts to put together a final product which contains

3    the Rolex trademark which essentially would be a product

4    of the type that I've discussed earlier in my testimony,

5    only now other people are doing it with parts sold by the

6    Defendant, that, if the Defendant knows or has reason to

7    know that that's what his purchases are doing, that that

8    is a trademark infringement.

9    Q    What's the theory of liability in that situation?

10   A    Well, it's called contributory trademark

11   infringement.

12   Q    Under what conditions, if any, is it okay -- is it

13   permitted -- to sell separately an individual replacement

14   part?

15   A    I am certainly willing to admit the existence of what

16   might be called a personal-use exemption.  I think a

17   person who, for example, owns a Rolex watch can go to a

18   jeweler and certainly have it repaired or to ask to have

19   it upgraded with non-Rolex parts.

20        There, of course, is the danger of post-purchase

21   confusion, but I'm willing to admit because I think most

22   people would feel that -- intuitively, that a person is

23   entitled to do that with their own property, and therefore

24   I think that the Defendant should be allowed to sell those

25   non-Rolex parts, as I understand it, intended for use only

McCARTHY - DIRECT                          IV-19

1   with Rolex watches, only if there is some indication from

2   the buyer that this will fit within the personal-use

3   exemption and, as I've stated in my expert report, I think

4   that requires a written statement from the jeweler who is

5   buying that -- that this is at the request of an owner of

6   the watch.

7        (Pause.)

8   Q    Professor McCarthy, I now want to turn to the subject

9   of Defendants' use of this crown-like device on certain of

10  its bracelets, and I will leave my mike here for a minute

11  to hand you Plaintiff's Exhibit 1 which is a genuine Rolex

12  bracelet with the true crown device on it and Plaintiff's

13  Exhibit 24 which is Defendant's bracelet with this crown-

14  like device.

15       (Witness proffered exhibit.)

16  BY MR. KANE:

17  Q    The assumptions as to those two articles are the

18  following:  Defendants' bracelets bear no markings showing

19  Defendants as the source; Defendants' bracelets are made

20  to fix Rolex watch heads; Defendants' bracelets are

21  substantially identical in appearance to Rolex bracelets;

22  Defendants have admitted that the Rolex crown design is a

23  strong mark; Defendant himself describes this design as a

24  crown, and my questions are these:  In your opinion, is

25  Defendants' use on PX-24 likely to cause confusion?

McCARTHY - CROSS                                    IV-48

1    A    Yes.

2    Q    If Plaintiff had not shown the likelihood of

3    confusion, they would (sic) be entitled to any of those

4    remedies that you have on pages 9 and 10, would they?

5    A    That's correct.

6    Q    You also assume that Plaintiff also showed or also

7    proved that there were trademarks at issue with respect to

8    the items at issue -- correct?  For example

9    (indiscernible).  I see you're frowning at my question.

10        The bracelet -- you assumed that the bracelet -- that

11   Rolex had a trademark with respect to the trademark and

12   that Rolex had also shown that there's a likelihood of

13   confusion with respect to that bracelet for you to make

14   your recommendation as to what disclosure should be.

15   A    No, I didn't assume that the bracelet per se was

16   trademarked.  I assumed that a non-Rolex bracelet which is

17   incorporated as part of a Rolex watch with the word,

18   "Rolex" on the dial becomes an infringement.

19   Q    Okay, well, let's talk about the bracelets that

20   aren't attached, okay?  Because your disclosure deals with

21   those, too, right?

22   A    Yes.

23   Q    With those that aren't attached to the watch, did you

24   make an assumption that Rolex had proved (sic) that the

25   brands are trademarked?

McCARTHY - CROSS                    IV-49

1   A    I made the assumption as to the Defendants' sale of

2   non-genuine Rolex bracelets to others -- I assume that's

3   what you're talking about -- separate, that the Defendant

4   had reason to know that his purchasers were going to

5   incorporate those as part of a watch which bore the Rolex

6   trademark.

7   Q    You answered a different question.  My question is,

8   when you made the -- when you made the determination of

9   what the proper disclosure would be for that bracelet, did

10  you make a determination that Rolex's bracelet was

11  trademarked?

12  A    No, I didn't have to.

13  Q    So, you did not make that determination.

14  A    It's not necessary.

15       (Pause.)

16  Q    You also assumed that the likelihood of confusion had

17  been demonstrated.

18  A    Yes.

19       (Pause.)

20  Q    Now, I'd like you to turn to page 9.  I'm going to

21  ask you about another case.  Using a report like this in

22  another case involving bracelets, replacement

23  bracelets -- right?

24  A    Another case?

25  Q    Another case where Rolex is the plaintiff.

1   REDIRECT EXAMINATION

2   BY MR. KANE:

3   Q    Professor McCarthy, does the absence of evidence of

4   actual confusion by purchasers of Defendants' altered

5   watches determine whether there is likely confusion?

6   A    No.  No trademark owner has the obligation to prove

7   instances of actual confusion.

8   Q    What must he prove in order to get an injunction as

9   an alternative?

10  A    He must prove that there is a likelihood of

11  confusion.

12  Q    When you stated on direct that Defendants should not

13  be permitted to sell altered watches with these non-Rolex

14  bezels and dials, what was the basis of your opinion?

15  A    The basis of my opinion was that there would be

16  likelihood of confusion caused by the sale of such

17  articles that are essential and integral to a watch.

18  Q    Now, at the close of your direct, you mentioned the

19  Intel case where in your -- I believe you characterized

20  the semiconductor chip as having been marked to indicate

21  it was a upgraded, genuine Intel chip; is that --

22  A    Yes, I mentioned that case.

23  Q    Was that upgrading of that chip held to be a

24  counterfeit?

25  A    It was held to -- yes, the Ninth Circuit Court of

Declaration of Donald R. Andersen

# Exhibit C

(a true and correct copy of the transcript of the testimony of J. Thomas McCarthy in the matter of *Rolex Watch U.S.A., Inc. v. Robert Meece*, U.S. District Court for the Northern District of Texas Civil Case No. 96-0805-H (CM))

NATIONAL ARCHIVES AND RECORDS ADMINISTRATION

# To all to whom these presents shall come. Greeting:

By virtue of the authority vested in me by the Archivist of the United States, I certify on his behalf, under the seal of the National Archives and Records Administration, that the attached reproduction(s) is a true and correct copy of documents in his custody.

| SIGNATURE | |
|---|---|
| *Twila Gore* | |
| NAME C. Preston Huff | DATE 4-2-08 |
| TITLE Regional Administrator | |

(seal)

NAME AND ADDRESS OF DEPOSITORY
National Archives and Records Administration
Southwest Region
1400 John Burgess Dr
Fort Worth, TX 76140-6222

☆ U.S. GOVERNMENT PRINTING OFFICE: 1996 – 403-191 / 39074

NA FORM 13040 (10-86)

Strasburger & Price, L.L.P.
901 Main Street
Dallas, Texas 75202
214-651-4300

BRIAN W. BROKATE
BETH M. FRENCHMAN
Gibney, Anthony & Flaherty, LLP
665 Fifth Avenue
New York, NY 10022
212-588-5151

DAVID H.T. KANE
Kane, Dalsimer, Sullivan,
 Kurucz, Levy, Eisele & Richard
711 Third Avenue
New York, NY 10017-4059
212-687-6000

For the Defendant:

MARK A. NACOL
MICHAEL P. WORTHAM
Nacol, Wortham & Assoc., P.C.
12001 N. Central Expressway
Dallas, Texas 75243
214-458-9500

SHANTEL BEHELER, CSR          METRO 817-226-1664

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

ROLEX WATCH, U.S.A., INC.      (      CIVIL ACTION NO.
                               (      3-95-CV-1058-T
VERSUS                         (
                               (
ROBERT MEECE d/b/a AMERICAN    (
WHOLESALE JEWELRY              (      February 10, 1997

--------------------
STATEMENT OF FACTS
VOLUME 1-B
--------------------

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

**FILED**

FEB 2 1 1997

NANCY DOHERTY, CLERK
By_____
Deputy

BEFORE THE HONORABLE ROBERT MALONEY
UNITED STATES DISTRICT JUDGE

**A P P E A R A N C E S:**

For the Plaintiff:            PATRICK F. McGOWAN
                              Strasburger & Price, L.L.P.
                              901 Main Street
                              Dallas, Texas 75202
                              214-651-4300

                              BRIAN W. BROKATE
                              BETH M. FRENCHMAN
                              Gibney, Anthony & Flaherty, LLP
                              665 Fifth Avenue
                              New York, NY 10022
                              212-588-5151

                              DAVID H.T. KANE
                              Kane, Dalsimer, Sullivan,
                               Kurucz, Levy, Eisele & Richard
                              711 Third Avenue
                              New York, NY 10017-4059
                              212-687-6000

For the Defendant:            MARK A. NACOL
                              MICHAEL P. WORTHAM
                              Nacol, Wortham & Assoc., P.C.
                              12001 N. Central Expressway
                              Dallas, Texas 75243
                              214-458-9500

A P P E A R A N C E S cont'd:

Court Reporter:                          SHANTEL BEHELER, CSR No. 3031
                                         1101-C Bert Drive
                                         Arlington, Texas 76012

Proceedings reported by mechanical stenography, transcript
produced by computer.

1      MR. McGOWAN:  Pass the witness.

2      MR. NACOL:  Just one question, Your Honor, on

3  this topic.

4                    RECROSS-EXAMINATION

5  BY MR. NACOL:

6  Q.  Mr. Meece, whether you sent it before or after, have you

7  ever sent any price list out without the disclaimer in a

8  separate document on the catalog or in some fashion, have you

9  ever solicited in violation of the injunction?

10  A.  No, sir.

11      MR. NACOL:  That's all.

12      THE COURT:  Anything further of this witness at

13  this time?

14      MR. McGOWAN:  No, sir.

15      THE COURT:  The witness may step down.

16      MR. McGOWAN:  Your Honor, we call Professor Tom

17  McCarthy, and Mr. David Kane will handle the direct

18  examination of Professor McCarthy.

19          (At this time Professor McCarthy was sworn in.)

20          PROFESSOR THOMAS McCARTHY, (Sworn)

21                   DIRECT EXAMINATION

22  BY MR. KANE:

23  Q.  Professor McCarthy, how long have you been teaching?

24  A.  I have just finished 30 years of teaching at the

25  University of San Francisco Law School.

1   Q.   And what subjects have you taught?

2   A.   This semester I am teaching a course in copyright law and

3   advance seminar in intellectual property law.   Last semester I

4   taught a course introduction to intellectual property, which

5   covered trademarks, trade secrets and an introduction to

6   patents, as well as a course in anti-trust law.   In years past

7   I have taught courses in civil procedure, equitable remedies

8   and consumer law.

9   Q.   Do you have any publications?

10  A.   I do.

11  Q.   What are they?

12  A.   I have three books that are currently in print.   I have a

13  five-volume treatise on trademarks of unfair competition law

14  published by Clark Borgman Publishers.   I have a two-volume

15  book on the rights of publicity and privacy, also published by

16  Clark Borgman.   And I have a one-volume reference book called

17  McCarthy's Desk Encyclopedia of Intellectual Property.

18  Q.   What is the title of that five-volume treatise?

19  A.   The official title is McCarthy On Trademarks And Unfair

20  Competition.

21  Q.   Has it been mentioned in any court decisions?

22  A.   Yes, I am pleased to report that it has been cited as

23  authority or relied upon in over 800 cases.

24  Q.   Have you been associated with any professional groups

25  involved in writing trademark and/or unfair competition law?

1    A.   I have, yes.

2    Q.   What are they?

3    A.   Well, a number of groups, two of which -- a most prominent

4    one is my service on the trademark review commission created

5    by the United States Trademark Association.  The review

6    commission put together the package of legislative materials

7    that eventually became the 1989 Trademark Revision Act.

8        The second service I performed was on an advisory board to

9    the American Law Institute, which drafted the restatement of

10   unfair competition, which was published in 1995.

11                MR. KANE:  Your Honor, plaintiff offers

12   Professor McCarthy as an expert qualified in practice, policy

13   and economic trademarks.

14                MR. NACOL:  No objection, Your Honor.

15                THE COURT:  You may proceed with the testimony.

16   BY MR. KANE:

17   Q.   Professor McCarthy, what general considerations are looked

18   to in fashioning injunctive relief from trademark cases?

19   A.   In my view, injunctive relief revolves around the two

20   basic policies of trademark law, the first of which is to

21   protect the public from the likelihood of confusion, and the

22   second is to protect the good will and reputation of trademark

23   owners.

24   Q.   Professor, I would like you to make a few assumptions, if

25   you will, and then I will ask you questions based on these

1 assumptions.  The assumption are these:  Assume that defendant

2 buys new Rolex watches and replaces the original watch bezels

3 on these watches with non-Rolex diamond bezels.

4      The bezel serves to preserve water resistant

5 characteristic of the watch.  If a bezel is not properly

6 constructed to precisely fit the watch, it could allow water

7 to leak into the case, which could ruin the movement.

8      Defendant also adds a refinished Rolex dial.  The

9 refinishing process involves these steps:  Removing the Rolex

10 trademark's hands and markers from the dial; applying a new

11 finish to the dial; drilling holes and adding diamonds to the

12 dial; replacing the trademark's markers and hands on the dial

13 and then remounting the dial back on the case in the movement.

14      The addition of refinished dials may affect the operation

15 of a Rolex watch.  If the diamonds are not properly set, they

16 may interfere with the clearance of the hands or they may

17 protrude into the back of the dial and scratch the date

18 mechanism which shows the date through the window.

19      Rolex will no longer guarantee or service Rolex watches

20 which contain non-Rolex bezels or dials.

21      Defendant sells these altered products under the mark

22 Rolex.

23      Based on these assumptions, what relief is appropriate

24 regarding defendant's watches sold under Rolex trademarks with

25 non-Rolex bezels and non-Rolex dials?

1          MR. NACOL:  Objection, Your Honor.  That

2   hypothetical includes several factors that are not before you

3   at this time or at the preliminary hearing.

4          THE COURT:  Sustained.

5          MR. KANE:  Your Honor, each one of the

6   assumptions is already in the record of this case, either at

7   the preliminary injunction hearing or at the Meece deposition

8   excerpts relied upon today, and I could read a cite into the

9   record for each one of those.

10          THE COURT:  I think you are going to have to do

11   that, because I don't recall all of those being in the record.

12          MR. KANE:  I would be happy to do so.

13       Assumption one:  Defendant buys new Rolex watches and

14   replaces the original Rolex bezels on these watches with

15   non-Rolex diamond bezels.

16      This was in the Meece deposition transcript at 113 and

17   114.

18          THE COURT:  Where is that?  I don't have that.

19          MR. KANE:  That is a listed exhibit.

20          MR. McGOWAN:  Your Honor, yes, sir, it is a

21   listed exhibit, either 38 or 39, and it was admitted into

22   evidence, and also we filed our deposition excerpts last week.

23          MR. NACOL:  If it please the Court, I think I

24   was going to be given an opportunity to review those excerpts

25   to provide with Your Honor's request that I tell you whether I

1    would or would not object to it.

2                   MR. McGOWAN:  We can read them in right now, but

3    I gave them to you last week.  We did offer to read it in.

4                   MR. KANE:  And we do offer to read it in.

5                   THE COURT:  Why don't you identify which

6    portions of your assumptions come from the deposition, then I

7    will admit the testimony subject to the acceptance of the

8    deposition into evidence, because I still want counsel to have

9    the opportunity to object to it.  So, if his objections are

10   sustained on any of your assumptions, your assumptions are

11   going to go out the window.

12                  MR. NACOL:  I know this gentleman is on a clock

13   and needs to get back.  I have no objection.

14                  MR. McGOWAN:  Your Honor, the one problem we

15   have is we asked per the Court's ruling of the local rules, we

16   gave the deposition excerpts last week.

17                  THE COURT:  But what does that have to do with

18   it?  I still have to rule on the matters.  Just because you

19   provided the other side with deposition excerpts doesn't put

20   it into evidence in the case.

21                  MR. KANE:  I think it's just the order of proof

22   here, Your Honor.  If we had expected counter designations, if

23   any, to come here before the trial began, then we were ready

24   to read it all in and have Your Honor rule, then we could ask

25   Professor McCarthy based on the record which is then in

VOL.1-B Pg33

1    evidence.   Because we didn't get counter designations and now

2    they are reserving their right to do so at some future time --

3                    THE COURT:   They don't have any right to

4    reserve -- we are not talking about counter designations, we

5    are talking about objections.

6                    MR. KANE:   Which would have to come right now?

7                    THE COURT:   Whenever it's being offered, that's

8    right.

9                    MR. KANE:   We are offering it right now, those

10   deposition excerpts.

11                   MR. McGOWAN:   Yes, sir, and we brought that up

12   this morning and we can read them right now into the record,

13   if that's fair.

14                   THE COURT:   You may have to do that.   You didn't

15   make it clear to me this morning that that was going to

16   include matters -- that your witness's testimony was going to

17   be contingent on that evidence being in.   So, that's why I

18   said, well, I can read it later if that's it, but I didn't

19   know that your witness was going to base that -- since you had

20   Mr. Meece on the stand, it just seemed to me that you would

21   ask him many of those questions that you felt you needed for

22   your assumption.

23                   MR. McGOWAN:   Your Honor, would it be acceptable

24   if Professor McCarthy steps down and we will read the

25   depositions in?

SHANTEL BEHELER, CSR          METRO 817-226-1664

VOL.1-B Pg34

1          THE COURT:  All right.

2          THE WITNESS:  Do you want me to exclude me from

3   the courtroom?

4          THE COURT:  Yes, sir.

5          MR. McGOWAN:  Your Honor, would you prefer that

6   I read both the questions and the answers or we can put Mr.

7   Sullivan on the stand and he can be Mr. Meece?

8          THE COURT:  Generally it's easier if you have

9   someone.  You can ask the questions and let someone else

10  respond with the answers, otherwise it's hard to tell where a

11  question ends and an answer begins.

12         MR. McGOWAN:  Mr. Sullivan, I am handing you

13  Plaintiff's Exhibit 39, which is the oral deposition of Robert

14  Meece.

15         I am sorry, we need to hand you, I think, the

16  confidential deposition volume also, and I will tell you the

17  court reporter separated it into two volumes.

18         Mr. Sullivan, if you could open your main volume to

19  Page 24.

20         MR. SULLIVAN:  Yes.

21         MR. McGOWAN:  Lines 7 through 11.  For purposes

22  of the trial today, you are Mr. Robert Meece.

23         MR. SULLIVAN:  Yes, sir.

24  "Q.  Am I correct that to this day you still sell some

25  authentic Rolex watches?

SHANTEL BEHELER, CSR          METRO 817-226-1664

VOL.1-B Pg67

1    MR. McGOWAN:  That's the end of our reading from

2    the preliminary injunction transcript.

3    MR. KANE:  Your Honor, with your permission, we

4    will bring the professor back in.

5    MR. NACOL:  May it please the Court, my memory

6    is not what it once was.  If they could repeat the predicate

7    again.

8    THE COURT:  Are you talking about the

9    assumptions?

10   MR. NACOL:  Yes.

11   PROFESSOR THOMAS McCARTHY, (Sworn)

12   DIRECT EXAMINATION cont'd

13   BY MR. KANE:

14   Q.  Professor, I will repeat the assumptions that I put to you

15   beforehand.

16   Number one, defendant buys new Rolex watches and replaces

17   the original Rolex bezels on these watches with non-Rolex

18   diamond bezels.

19   The bezel serves to preserve the water-resistant

20   characteristic of the watch.

21   If a bezel is not properly constructed to precisely fit

22   the watch, it could allow water to leak into the case, which

23   could ruin the movement.

24   Defendant also adds a refinished Rolex dial.  The

25   refinishing process involves the steps removing the dial from

16

1    the watch, removing the Rolex trademark's hands and markers,

2    applying a new finish to the dial, drilling holes and adding

3    diamonds to the dial, replacing trademarks, markers and hands

4    on the dial, and replacing the dial into the watch.

5    The addition of refinished dials may affect the operation

6    of the Rolex watch.  If the diamonds are not properly set, the

7    diamonds may interfere with the clearance of hands or may

8    protrude into the back of the dial and cause a problem with

9    the calandar mechanism.

10    Rolex will no longer guarantee or service watches which

11    contain non-Rolex bezels and dials.

12    Defendant sells the altered products, the altered Rolex

13    watches, that is, under the trademark Rolex.

14    My question, based on these assumptions, is this:  What

15    relief is appropriate regarding defendant's watches sold under

16    Rolex trademarks with non-Rolex bezels and non-Rolex dials?

17    MR. NACOL:  No objection.

18    A.  In order to serve the two goals of trademark law that I

19    mentioned earlier, in my view an absolute injunction is

20    necessary because the sale of new and reconstructed watches

21    involves, in my view, an essential and basic change to a

22    necessary integral element of the watch in such a way that to

23    label it as a Rolex watch would be deceptive and misleading

24    and likely to cause confusion.

25    Q.  Is Rolex still controlling the quality of the altered

VOL.1-B Pg69

1   product?

2   A.   Well, they are not, and it is a right and a duty of every

3   trademark owner to control the nature and quality of goods

4   that are sold under its trademark.

5   Q.   What connection does the name Rolex have with this

6   product?

7   A.   The only connection is that at one time part of the

8   product was manufactured by the Rolex watch company, but the

9   final product, as sold by the defendant, has not been

10   manufactured under the control of the Rolex watch company, nor

11   has the Rolex company had the opportunity to control the

12   nature and quality of the goods.

13            MR. NACOL:  I am sorry, to control what, sir?

14            THE WITNESS:  To control the nature and quality

15   of the goods.

16   BY MR. KANE:

17   Q.   Is there any case support for the grant of an absolute

18   injunction in this situation?

19   A.   There is, yes.

20   Q.   What is that?

21   A.   In one instance someone took a Bullova watch movement and

22   took them out and put them in a non-Bullova casing studded

23   with diamonds, and it was held there that an absolute

24   injunction was necessary, that disclosure was not appropriate,

25   was not adequate to protect the public from confusion.

Q. Would a permanent marking on defendant's altered Rolex

watches solve this problem?

A. I think not. A permanent marking or disclosure of any

type is not appropriate because this case does not, as I

understand it, involve the repair or the reconstruction or

restoration of the product. Rather, in your question you

asked about new watches, which involve no aspect of repair.

Q. What is the significance of the fact that defendant has

admitted that the quality of its non-Rolex parts are not as

good as Rolex quality?

A. Well, it indicates that in this particular case the damage

to the trademark owner is not merely theoretical or

hypothetical, but in fact the defendant's goods are inferior,

although that is not necessary for the plaintiff to prove.

Q. That was my next question. Is a lesser quality, which

happens to be of record here, necessary to support the

absolute prohibition which you have commented on?

A. No, it is not, because as I just indicated, the trademark

owner has the right, as well as the duty, to control the

nature and quality of goods that are put out under that

trademark owned by that trademark owner. And if that

opportunity is missing, then the product is not genuine.

Q. I would like to turn now to additional assumptions which

are supported by the record in this case.

    First of all, that defendant sold bracelets that look

VOL.1-B Pg71

1    similar in appearance to Rolex bracelets;

2        That these bracelets are designed, for the most part, to

3    fit Rolex watches;

4        That the quality of defendant's bracelets are not as good

5    as Rolex quality;

6        That the consumer, the ultimate wearer of the watch,

7    wouldn't be able to trace defendant's bracelets back to

8    defendant.

9        In these circumstances, will likely confusion be prevented

10   by disclosing on a hang tag or an invoice to the direct

11   purchaser, the jeweler, that bracelets do not originate with

12   Rolex and that defendants are not affiliated with Rolex?

13   A.   I think that in that instance a hang tag is inadequate to

14   protect against confusion.

15   Q.   And the invoice disclosure?

16   A.   Invoice would be similarly inadequate.

17   Q.   What is the reason for that view?

18   A.   Because neither of those disclosures go with the product

19   and they fail to reach others who could be confused by the

20   trademark on the product.  Others would include downstream

21   purchasers, donees, people who are given the watch as a gift,

22   and simply viewers, people who see others wearing the watch or

23   band.

24   Q.   As to these replacement bracelets not made by Rolex, are

25   you aware of any notice that would be sufficient?

VOL.1-B Pg72

A.  Well, in my view some type of permanent marking with a

trademark indicating source on the band itself would be

necessary to go with the product.

Q.  Can you give an example of a situation where a permanent

marking was required?

A.  The leading example would be in the Champion Spark Plug

case where the Supreme Court indicated that in a situation

involving repair and the restoration of used spark plugs was

necessary to permanently stamp and bake the words "used" or

"repaired" into the spark plugs themselves, as well as the

spark plugs being entirely repainted in an aluminum color,

that that was necessary to protect against confusion in that

instance.

Q.  In the case of these non-Rolex replacement bracelets, how

do you envision the permanent marking being affixed?

A.  Ideally to protect those others that I mentioned,

downstream purchasers, donees and viewers, a marking of some

trademark on the band, outer appearance of the band would be

necessary, but I understand that that could injure the ability

to sell the product in that it might have some aesthetic

detriment and I would be willing to take a second best

position and permit the engraving to be on the clasp, which is

visible when the band is opened.

Q.  Let me now move on to a different series of assumptions as

follows:

VOL.1-B Pg73

1    Defendant sell non-Rolex bezels, dials, and bracelets

2    made to fit Rolex watches.

3        Defendant's non-Rolex replacement parts do not fit

4    other watches without adjustment.

5        Defendant's non-Rolex parts are not marked to

6    indicate American Wholesale, that's the defendant, as their

7    source.

8        Rolex itself does sell genuine replacement parts in

9    each of these categories.

10       My question is, what does plaintiff need to show to

11   establish defendant's liability for infringement through sale

12   of these parts?

13   A.  In my view, the plaintiff would have to show that the

14   defendant either knew or had reason to know that his

15   purchasers were using the parts to construct or reconstruct

16   watches which had the Rolex trademark on them.

17   Q.  What's the theory of liability in that situation?

18   A.  Well, it's called contributory infringement of trademark.

19   Q.  Under what conditions, if any, is it okay to sell

20   separately an individual placement part?

21   A.  Excuse me, could you repeated the question?

22   Q.  Under what circumstance, if any, is it proper to sell

23   separately an individual replacement part?

24   A.  Although in theory one could take the position that under

25   no circumstance should such parts be sold because of the

VOL.1-B Pg74

1   opportunity and likelihood of confusion of the others that I

2   mentioned in the public, I am willing to admit the existence

3   of why it might be called a personal use exemption; that is, a

4   person who in the course of repairing or restoring a used

5   watch, I believe, should have the opportunity at the same time

6   to upgrade it to a higher level or higher model if they wish,

7   but I think there has to be some documentation, some proof of

8   that flowing to the supplier.

9   Q.  I now want to turn to a series of crown designs that have

10  come in the record of this case.

11      Your Honor, I think Plaintiff's Exhibit 16 is a Rolex

12  watch that may be over on that side of the courtroom, a gold

13  President watch.

14  Q.  Professor McCarthy, I show you Plaintiff's Exhibit 16 and

15  we will have questions about it shortly, also Plaintiff's

16  Exhibit 3, which is one of defendant's brochures, and then I

17  need Plaintiff's 66.  This bracelet is Plaintiff's Exhibit 66.

18      First of all, the assumptions, Professor McCarthy:

19      Defendant's bracelets bear no markings to show defendant's

20  American Wholesale Jewelers as the source.

21      Defendant's bracelets are made to fit Rolex watch heads.

22      Defendant's bracelets are similar in appearance to Rolex

23  bracelets.

24      The Rolex Crown design mark is the subject of an

25  incontestable registration and has been used for over 35

VOL.1-B Pg75

1    years.

2        An example of it is there before you on Plaintiff's

3    Exhibit 16, the men's gold watch.

4        Defendant's use is also before you in the brochure, PX 3,

5    where you see something we have referred to as a five-prong

6    device.  Do you see that?

7    A.  Yes, I do.

8    Q.  And then a more recent use by defendant is in Plaintiff's

9    Exhibit 66, the small lady's bracelet, which has a four-sided

10   kind of a truncated crown device outlining the crown.

11       My question is this:  Is defendant's use likely to cause

12   confusion?

13   A.  In my view, both of the defendant's uses are likely to

14   cause confusion.

15   Q.  Is your opinion changed by a detailed side-by-side

16   comparison of the examples of the two crowns I have given you?

17   A.  I don't think it's proper to make a detailed side-by-side

18   comparison.  That's not the way consumers would view them in

19   the marketplace, and that's the object of trademark law, to

20   try to reproduce the marketplace in the courtroom to the

21   greatest extent we can.

22   Q.  In judging the similarity of those crown symbols, is

23   consumer recollection of plaintiff's mind expected to be

24   perfect?

25   A.  Well, of course not.  A consumer may well have a general

VOL.1-B Pg76

18

1   or vague recollection of the crown design and carry that with

2   them and see other similar designs perhaps at a distance and

3   be confused.

4   Q.  Will consumer reactions be affected by the fact that

5   defendant's design is used on a product which looks similar to

6   the Rolex product?

7   A.  Well, of course.  We have to compare the conflicting

8   designs or trademark logos as they appear on the product in

9   the context in which people actually see them on the watch

10  band, and it appears, as far as I can tell, at the identical

11  same location on a very similar watchband.

12  Q.  I ask you now about possible price differences and, in

13  particular, ask you to make the assumption that defendant's

14  bracelet bearing the crown-like device, it's priced

15  considerably less than the comparable Rolex bracelet.  Is that

16  a defense?

17  A.  No, that is not a defense.  That is not even a defense to

18  a charge of criminal counterfeiting.

19  Q.  Why is that so?

20  A.  Because even though the initial purchaser may know that

21  this is a counterfeit -- for example, the purchaser of a $25

22  Rolex watch knows that it is not a genuine Rolex, but that

23  says nothing about the other members of the public that have

24  indicated in terms of post-purchase confusion of downstream

25  purchasers, donees and viewers.

VOL.1-B Pg77

Q.  Let me ask you now about a different situation, still

involving bracelets, and make these assumptions if you will.

Defendant sell a non-original replacement bracelet with a

genuine Rolex clasp on it.  That clasp bears the Rolex name

and the Rolex Crown device.

Also assume that at least some cases a customer supplies

the genuine Rolex clasp.  Assume it's in all cases.  The

customer supplies the genuine Rolex clasp which defendant

installs on a non-Rolex bracelet.

My question is this:  Does the fact that the customer

furnish the clasp and requested the installation avoid

liability?

A.  No, it does not.

Q.  Why is that so?

A.  For the same reason that the person who purchases a

counterfeit knowing that it is a counterfeit, it does not form

a defense to a charge of infringement.  The person who wants

to create a counterfeit knows it is not, but that creates

post-purchase confusion, nonetheless.

Q.  Would you consider defendant's altered Rolex watches with

non-original bezels, dials and/or bracelets to be counterfeit

within the meaning of 15 U.S.C. 1117?

A.  I do.

Q.  Why is that?

A.  Because it by definition contains a mark which is

VOL.1-B Pg78

1    identical to a genuine Rolex mark, and a counterfeit is a

2    product which contains a mark which is either identical to or

3    substantially indistinguishable from a genuine mark.  Here the

4    mark is identical.

5    Q.   Is selling to people who no the product contains

6    non-original parts a defense?

7    A.   No, it is not.

8    Q.   Does the fact that defendant's use of the original marks,

9    not copy marks, prevent a finding of counterfeit?

10   A.   It doesn't prevent a finding of counterfeit.  In my

11   opinion, it does not make it less of a counterfeit; it makes

12   it more of a counterfeit, because it makes it easier to pass

13   off as the original because it is in fact a mark that came

14   from the Rolex watch company, but it is not a Rolex watch.

15   Q.   Does the fact that diamonds were used in defendant's

16   operations, thus resulting in a more expensive product, affect

17   the determination of whether the product is a counterfeit?

18   A.   Well, in my view, it makes it more likely that it does

19   fall in the category of being a counterfeit because the

20   addition of diamonds creates the false impression that this is

21   a high-level diamond studded Rolex watch produced by the Rolex

22   Watch Company, and the Rolex Watch Company, it's my

23   understanding, does produce such high-level diamond studded

24   watches, and it is not from the Rolex Watch Company.

25   Q.   Are you familiar with upgrading situations previously

VOL.1-B Pg79

1    decided by the Courts?

2    A.   The precedent closest in my mind to this situation is

3    where someone took slower, less expensive ~~entailed~~ *Intel* branded

4    semiconductors, changed the model designation to make it

5    appear that these were faster, more expensive intel

6    semiconductors and was held to be, in that instance, both

7    trademark infringement and trademark counterfeiting.

8    Q.   As to monetary relief, Professor McCarthy, assuming that

9    the altered Rolex watches are considered counterfeit, what

10   monetary relief is Rolex entitled to?

11   A.   In that instance, trouble damages or trouble profits and

12   attorney fees, absent extenuating circumstances, would be

13   mandatory.

14   Q.   Do you need to show defendant's intent to deceive to

15   qualify for a mandatory award?

16   A.   No, intent to deceive is not required.  What is required

17   is an intent to deal in the goods knowing that they are

18   counterfeit goods.

19   Q.   Assuming the altered watches are not counterfeit, must the

20   trademark owner prove damage or lost sales to recover

21   plaintiff's profits for infringement?

22   A.   Well, not to recover profits.  To recover the profits, the

23   plaintiff would have to show unjust enrichment and a

24   deliberate and knowing infringement.

25            MR. NACOL:  Your Honor, if it please the Court,

VOL.1-B Pg80

1   I have no objection to the demeanor of the gentleman, but this

2   is like a CLE class.  I object to opinions are not relevant to

3   anything specifically in this inquiry raised by the facts for

4   which a predicate has been established.

5                    THE COURT:  Overruled.

6   BY MR. KANE:

7   Q.  As to the attorneys' fees element of a possible monetary

8   award, what must plaintiff prove?

9   A.  Prove that it's an exceptional case.

10  Q.  What is an exceptional case?

11  A.  Exceptional case would involve some form of knowing and

12  deliberate infringements.

13  Q.  In assessing intentional infringement, would you consider

14  any of the following conduct to be relevant:

15      One, defendant's past use of a nearly identical crown

16  design;

17      Defendant's current use of a crown imitation;

18      Defendant's failure to identify the watch as coming from

19  him;

20      Defendant's past sales of converted recased watches;

21      Defendant's past substitution of an older movement in a

22  watch submitted to him for conversion without disclosure to

23  the customer?

24      Are these factors relevant in assessing intentional

25  infringement?

VOL.1-B Pg81

A.  In my view, they are relevant and probative, yes, of

infringement.

Q.  Why is that?

A.  Because they all indicate the presence of knowing and

deliberate infringement.

Q.  Well, in summary, then, what is your opinion where a new

Rolex watch is sold with non-genuine parts?

A.  I think in that instance confusion of the public is

inevitable.

          MR. KANE:  Your Honor, pass the witness.

          THE COURT:  Let's take a break at this time,

about a 15-minute break.

                    (Brief recess.)

                  CROSS-EXAMINATION

BY MR. NACOL:

Q.  Good afternoon.  Is it Dr. McCarthy?

A.  Whatever you are comfortable with.

Q.  What are you comfortable with?

A.  Professor.

Q.  Professor McCarthy, will you agree with me that the first

principle of unfair competition law is that everything that is

not protected by an intellectual copyright is free to be

copied?  In fact, copying is the essential part of an old

family of an economic system for free competition.  Thus, the

active copying far from being intrinsically improper is

VOL.1-B Pg82

1   essential and should be lotted and encouraged, not condemned.

2        Do you agree with that?

3   A.   I do.

4   Q.   You wrote those words, didn't you?

5   A.   It sounds familiar.

6   Q.   When intellectual property comes into play, however,

7   certain rights are protected, correct?

8   A.   That's correct.

9   Q.   As in this case, a likelihood of confusion must exist

10  before there is really any right to do much of anything with

11  regard to what my client has done?

12  A.   Likelihood of confusion is necessary.

13  Q.   And that's more than a mere possibility, isn't it?

14  A.   Likelihood means probability, yes.

15  Q.   And it's the burden of the plaintiff in this case to prove

16  by a preponderance that the public is indeed likely to be

17  confused over what's occurred here?

18  A.   That's correct.

19  Q.   Now, sir, you brought up in your testimony the fact that

20  you thought there was some comparison between the Champion

21  Spark Plug case and this case.  Do you really think that it is

22  appropriate or desirable to stamp "used" on a $4,000 or $3,000

23  watchband replacement part for a Rolex band?

24  A.   I believe my testimony indicated that with my opinion that

25  some form of engraving of a trademark on the band or the clasp

VOL.1-B Pg83

1    of the band would be necessary.  I don't believe I indicated

2    that the word "used" had to be stamped.

3    Q.  In that case you were talking about fraud coming out of

4    spark plugs, were you not?  Those facts are not relevant to a

5    case where the buyer is far more sophisticated.  Isn't that a

6    fair statement?

7    A.  Assuming that the buyer is sophisticated and knows this is

8    not a genuine Rolex band, I think is the assumption, that says

9    nothing about post-purchase confusion.

10   Q.  And point of fact, would you agree with the statement:

11   Obviously the price level of goods and services are an

12   important factor in determining the amount of care a

13   reasonably prudent buyer would use?  Do you agree with that

14   statement?

15   A.  Yes, I do.

16   Q.  You have heard that one before, too, haven't you?

17   A.  It sounds like it's from my book.

18   Q.  And don't you consider Rolex, any Rolex, is a very

19   expensive idea?

20   A.  Very expensive, yes.

21   Q.  And you have to put yourself in the shoes of the buyer

22   who's buying the Rolex product when considering the standard

23   of care, don't you?

24   A.  When considering the likelihood of confusion of that

25   buyer, yes.

VOL.1-B Pg84

Q. And in point of fact, with an expensive item like a Rolex watch, as a matter of law, that standard is elevated, the standard of confusion must be elevated; is that not correct?

A. For the immediate purchaser, that's correct.

Q. And I think the word used is elevated to the standard of what's called the "discriminating" purchaser?

A. That's correct.

Q. And isn't that what we are dealing with here, a higher level of standard of care, a higher level discriminating purchaser?

A. Not necessarily for the downstream purchasers or donees or viewers.

Q. Well, haven't we heard testimony throughout this trial that the secondary market is one of the strongest markets in the country for watches?

A. I don't know. I was not in the courtroom.

Q. Do you know or do you know of personal knowledge whether the Rolex secondary market is very good in this country?

A. That's my understanding.

Q. And point of fact, some people can buy a watch and not lose a dollar over 17 years, can't they?

A. I don't know.

Q. Would you assume that if that had been said in the testimony previous to your testimony if that's the case?

A. It sounds reasonable, yes.

VOL.1-B Pg85

Q. Wouldn't you say that the downstream folks who you are

worrying about contributory negligence applying to that those

folks would be discriminating themselves?

A. Not necessarily.

Q. You don't think that the standard of care, according to

you in your textbook, that applies to expensive items being

elevated to a discriminating purchaser would be the same if

the price stays high throughout the tenure of the life of the

item?

A. Are we talking about the bands or the watches?

Q. I am talking about -- let's take, for example, a $25,000

watch that's worth $16,000 15 years later or $18,000.  Don't

you think that it's still going to take a pretty

discriminating person to spend that kind of money on something

that's not food or clothing or a home or something in your

home?

A. Even if they are discriminating, how are they going to

know that these diamond bezels and dials did not come from the

Rolex Watch Company?

            MR. NACOL:  Objection to nonresponsive of the

answer, Your Honor.

            THE COURT:  Sustained.

BY MR. NACOL:

Q. Don't you think they are less likely to be confused even

in the dounstream secondary market about a product such as

VOL.1-B Pg86

1  Rolex in the "discriminating" purchaser category because of

2  the expense under the additional care they are taking?

3  A.  No, not in this case.

4  Q.  And point of fact, haven't you categorized buyers of the

5  Rolex type product as professional buyers?

6  A.  Not to my knowledge.

7  Q.  You don't recall ever using that term, buyers who are

8  expected to be more discriminating and knowledgeable in making

9  purchases with a heightened standard of care when it comes to

10  the likelihood of the future?

11  A.  For professional buyers, people who are in the business of

12  buying, that's correct.

13  Q.  Would you not agree that the definition of this manner of

14  that standard of care should be that the relevant buyer class

15  as professional buyers is based on the evidence that this case

16  will present?

17  A.  Well, that hasn't been my testimony on direct.

18  Q.  I understand that, but is it not your feeling or opinion

19  that the buyers in this case are of that highest level of

20  consciousness?

21  A.  My understand is that immediate buyers from the defendant

22  are professional jewelers, and I would expect them to be of a

23  high level of discrimination and knowledge.

24  Q.  And you have asked His Honor here today to grant an

25  absolute injunction, haven't you?

VOL.1-B Pg87

A.   I have, yes, that's my opinion.

Q.   If, for instance, sir, someone was very wealthy at one time in oil or banking or real estate, whatever industry has failed over the last 30 years, spends $30,000 on a watch and after 10 or 15 or 20 years he no longer has money and he chooses just to buy another band for that watch.  If His Honor takes your advice and grants that absolute injunction, where will this person have to go to get his watch?

A.   My testimony, I believe, indicates --

Q.   Watchband, I mean.

     If the injunction is granted, who is left except Rolex to give him a band he can afford?

A.   I believe my expert's report, as consistent with my testimony, indicates that I'm fully willing to permit people with used Rolex watches to buy upgraded diamond bands when they desire to do so, as long as there is a certificate indicating that that is the fact.

Q.   And that's the personal exemption?

A.   Personal use, that's what I refer to as a personal use exemption.

Q.   Sir, if that clasp is not changed by the person that you say here today should have the right to do that, and the purchaser simply takes it home and changes the clasp -- they own the clasp, they take it home and put it on the generic custom band -- don't you have all the downstream contamination

VOL.1-B Pg88

1    that you are talking about today?

2    A.  You do.  I don't understand why someone would want to take

3    a trademark clasp and put it on a new watchband.

4    Q.  That's not what I said.  I said, if they take the

5    trademark clasp and put it on the generic band, isn't that

6    what we are all about, that that is bad, that that's the bad

7    thing that's going to get people in trouble?

8    A.  That creates a counterfeit watchband.

9    Q.  How do you explain to His Honor that you want an absolute

10   injunction in this hand but give personal exemption when the

11   very same result is going to occur?

12   A.  Because absolute injunction refers to the reconstruction

13   of new watches.  That, I think, should be prohibited.

14   Q.  And we are talking about conversions.  That's what your

15   absolute request of His Honor was was conversion?

16   A.  Just to make sure we are on the same page, by conversion

17   you mean --

18   Q.  You start off with a silver watch and end up with a

19   Submariner that's blue and gold and it looks brand new, the

20   only thing available was the movement and the dial and

21   everything else is changed.

22   A.  And this is a new watch?

23   Q.  Yes.

24   A.  Yes, that's what I was referring to as requiring an

25   absolute injunction.

VOL.1-B Pg89

Q.  Did your attorneys indicate to you today that we
stipulated a year ago to do that already?

A.  No.

Q.  Besides that injunction, as far as the band goes, to meet
your idea of being a fair product that won't contaminate
downstream and to satisfy your personal use, are you saying
just put the initials inside the clasp?

A.  Some type of indication of some trademark.  The important
point is to indicate to people that this is not a Rolex band.

Q.  Wouldn't "Made in Italy" do that if there was never one
Rolex in the history of the universe ever made with "Made in
Italy" in that band clasp?

A.  I don't think "Made in Italy" is sufficient.

Q.  Why?

A.  Because it is not a trademark and I don't see how it would
indicate to ordinary people as opposed to professionals that
this is not a Rolex product.

Q.  If we write Bob Meece in that clasp next to "Made in
Italy," how is that downstream person not going to think
that's just a Rolex watch that used to be owned by a guy named
Bob Meece and a gift?

A.  We are trying to inform people that this is not a Rolex
band and anything which goes in that direction indicating
somebody's name, the identity of some entity or some person, I
think, can accomplish that.

SHANTEL BEHELER, CSR          METRO 817-226-1664

VOL.1-B Pg90

Q.   Isn't the whole concept of the Rolex watch the finest Switzerland can offer?  Isn't that what it's about?

A.   That, I believe, is its reputation.

Q.   If you slap "Made in Italy" in it, don't you think that would bring the "elevated" purchaser to a level of a higher standard where they know what they are buying?

A.   I don't think so because it does not indicate a commercial source.  It indicates where the product was constructed.

Q.   Now, you used the word counterfeit a lot on your direct examination.  Do you have any evidence upon which to base that this gentlemen to my right, Mr. Meece, is a counterfeiter?

A.   Well, the questions that were asked, the hypothetical question to me indicated and I answered that it was in my opinion counterfeit goods.

Q.   You are the expert in this area, correct?

A.   That's correct.

Q.   You have written many volumes, correct?

A.   Yes.

Q.   And you understand what estoppel, laches and acquiescence mean, do you not?

A.   I believe so.

Q.   And you understand the host of defenses apply, do you not?

A.   Yes.

Q.   Can you tell His Honor how many people you have represented or testified before in the past who were -- strike

SHANTEL BEHELER, CSR          METRO 817-226-1664

VOL.1-B Pg91

1    that -- how many counterfeiters you have dealt with in your

2    litigation before who had a series of five to ten

3    correspondences over the years meeting the request of Rolex as

4    to advertising, disclosures, and other matters.

5            MR. KANE:  Objection, Your Honor.  The record is

6    not there to support that question, especially as to new

7    watches, but especially as to the point that there was

8    correspondence and all the objections were met.

9            MR. NACOL:  Your Honor, I am trying to keep -- I

10   haven't had my chance to put my evidence in.  If they had all

11   these letters.  You had them in the preliminary hearing.  I

12   don't think I am putting anything on that's not going to come

13   into evidence.  If he needs to hang around tomorrow while I

14   put my case on, I can.  I think those letters are in evidence,

15   in the preliminary hearing.  If you have already adopted that

16   information, they are in evidence.

17           MR. KANE:  It's the characterization as much of

18   the letters, speaking about all these letters and all these

19   things.

20           MR. NACOL:  Let me just read the relevant

21   portions.

22   BY MR. NACOL:

23   Q.  How many counterfeiters do you know that upon commiting an

24   act that's inappropriate send out a clarification notice to

25   every jeweler in the United States of America stating they

VOL.1-B Pg92

1   made a mistake, they don't want to do any counterfeiting and

2   it's improper, how many do you know who have done that?

3   A.  I have not seen that happen before.

4   Q.  How many counterfeiters in Rolex cases do you know who on

5   March 2 of 1994 send a letter to Gibney, Anthony and Flaherty,

6   the plaintiff's law firm in this case, thanking them for

7   reminding him that his September 7, '93 letter with the

8   wording "Not an official Rolex jeweler or affiliated with

9   Rolex U.S.A. Inc. in any way" needed to be bigger, who

10  indicates in the second paragraph that he faxed to the

11  national jeweler to make certain the next future advertising

12  would use diligence to make sure that was done?  Have you ever

13  known a counterfeiter in those circumstances to work with the

14  person he's supposedly counterfeiting?

15  A.  No one.

16  Q.  How many counterfeiters do you know who would in September

17  of 1993 regarding alleged misuse of Rolex trademarks in a

18  previous letter to him of August 27, '93, speak with regard to

19  counter display and the not affiliated language on the counter

20  and not official dealer and in any way better than we will use

21  the phrase in the future and make it bigger, that they will

22  use that phrase and make it bigger and that it is not our

23  intention to confuse or mislead, and a second paragraph with

24  regard to a price sheet, will agree to put all disclaimers on

25  price sheets?  Do you know any folks that are willing to work

SHANTEL BEHELER, CSR          METRO 817-226-1664

VOL.1-B Pg93

1   with the case in chief?

2   A.   No, I am not aware of any.

3   Q.   Are those the type of things you would describe to your

4   definition of counterfeiter?

5   A.   I was attempting to give the legal definition of what a

6   counterfeiter is as opposed to sort of a popular view of what

7   a counterfeiter ought to look like.

8   Q.   And your point with counterfeiter is that unless there is

9   an extreme bad faith, intent to really counterfeit a product,

10   attorneys' fees are not appropriate in a case like this?

11   A.   There has to be evidence of some knowing or intentional

12   acts of infringement if it is not a counterfeit to get

13   attorneys' fees.  If it is a counterfeit, then attorneys' fees

14   would be mandatory except in exceptional circumstances.

15   Q.   Let's suppose that in a given case a gentleman doesn't

16   counterfeit but does infringe in advertisement and out of four

17   million dollars a year worth of work he does take in six

18   watches, two of which from a private eye from the holder of

19   the mark, and in that circumstance, five months before suit is

20   filed, he sends this disclaimer that that was wrong and he

21   will never do it again, and he doesn't do it again, he keeps

22   his word, but suit is filed anyway five months later and the

23   claim is for attorneys' fees for infringement.  Do you think

24   attorneys' fees should lie in that situation where the company

25   voluntarily ceased activities, communicated that voluntary

1   ceasing and stopped five months before suit was filed?

2   A.   Should I assume all these facts are true and proven?

3   Q.   Yes.

4   A.   It sounds like a situation absent other evidence that

5   would not be intentional and knowing.

6   Q.   Now, the Bullova case was about conversions?

7   A.   The Bullova case was about taking a Bullova movement and

8   putting it in a diamond studded case.

9   Q.   But that was a conversion case like going from a stainless

10   steel to a Submariner.  We weren't talking about trade dress

11   in the Bullova case, were we?

12   A.   No, we are talking about the trademark, the name, the word

13   itself, Bullova.

14   Q.   Well, the band, Rolex doesn't own the right to the band,

15   do they, they don't have a trademark in the band?

16   A.   Not in the appearance of the band per se, I am not

17   assuming that they do.

18   Q.   These are trade dress items.  So the Bullova doesn't even

19   apply to this case, does it?

20   A.   It does apply.

21   Q.   If you assume that conversion is not in this case, we

22   stipulate that out months ago, Bullova really would not apply

23   to these facts, would it?

24   A.   I am confused because the relevance of the Bullova case is

25   taking an essential part of a watch and putting it with other

VOL.1-B Pg95

3

1   important parts to arrive at a final product which is not a

2   genuine trademark product. That is the basis of my opinion

3   about the absolute injunction.

4   Q. Well, certainly the Champion case we are talking about $2

5   spark plugs doesn't apply to a $20,000 watch, does it?

6   A. I think that the Champion case involved restoring or

7   repairing products, and it required even in that situation,

8   which is less egregious than changing a product without

9   repairing it, needed permanent marking.

10  Q. If you feel there is a personal exemption for someone to

11  buy part of the trade dress or for his personal use to go

12  ahead and alter the item to the extent that you have indicated

13  so far, if that same person wishes to buy a new Rolex watch

14  and a generic band because he just has enough money for that

15  combination, as long as the same disclosures that you have

16  indicated before go with that item, what is the difference

17  in --

18  A. I think not. The difference is between a used watch and a

19  new watch. I see a significant difference.

20  Q. But the presentation in both cases is from the retailer,

21  isn't it?

22  A. Yes, but in the case of the used watch there is the aspect

23  of repair and restoration, which I think is key to the

24  personal use exemption.

25  Q. I am sorry, explain that to me.

VOL.1-B Pg96

A.  The personal use exemption, as I have characterized it,
although not a rule of law, it's just my view of what seems
reasonable and necessary under the circumstances, are takes of
the notion that part of the watch is worn out, it needs to be
restored and repaired, and as a part of that process the
person wants to upgrade the band or the bezel or the dial or
all three with diamond to make it a higher level product.
That's what I characterize as a personal use exemption to
permit that kind of situation.  I see no need to do that, I
see no rationale to do that with a brand-new watch.

Q.  Don't you think there has been testimony from one of the
plaintiff's witnesses that there is a definite benefit to the
public to have someone to sell generic parts so that you can
combine the highest quality of some items with the lower price
of other items?  Do you agree with that?

A.  I don't think that's the defense at all.

Q.  No, my question is do you agree that people should be able
to buy a $3,000 instead of $8,000 bracelet?

A.  Not if it's a counterfeit bracelet.

Q.  If it doesn't fit your category of counterfeit -- I
understand how you feel.  You are an expert.  You have a right
to your opinions.  But if others don't share that opinion, if
they feel the trade dress is protected enough with the
existing insignia discriminating it from others, don't you
think the public benefits from the right to have that choice?

VOL.1-B Pg97

A.  Only in the same sense the public benefits by being able
to buy a $25 Rolex watch that's not made by the Rolex Watch
Company.  I don't see that that's a rationale to permit
conduct that would otherwise be illegal.

Q.  Do you know of any $25 bracelets Mr. Meece has sold?

A.  No, but I think the principle is the same of taking a
product that is not genuine.

Q.  Well, we don't even get a disclosure as to whether it's on
the products, whether it's on tags, whether it's in the box,
we don't get to disclosures area and it's not appropriate to
even rule in that fashion unless you find an actual trademark
infringement, correct?

A.  That's correct.

Q.  So if that burden is met on its face, then all these other
disclosures are not necessary, and even though they may be
problematical, they are not indicated, are they?

A.  If that burden is not met by the plaintiff, then the
question of remedies is irrelevant, that's correct.

Q.  And there is no entitlement to any recovery of damages if
there is no proof of confusion or deception, is there?

A.  Recovery of out-of-pocket damages requires some proof of
actual deception in most cases.

Q.  In personal facts, your personal use exemption means that
people should be able to do with their products what they want
to, doesn't it?

VOL.1-B Pg98

1    A.  I think that's probably too broad a generalization.

2    Q.  Well, have you ever made that statement under oath, sworn

3    testimony to that statement in a previous hearing?

4    A.  Yes, I did.  I recall making that statement in a case last

5    month in San Diego which involved a different set of facts.

6    Q.  That was a Rolex case, too, right?

7    A.  Yes, but there was no sale of new watches.

8    Q.  How many cases do you testify for Rolex a year?

9    A.  This year?  This is the second one.  I have never done so

10   before.

11   Q.  Do you testify a lot as an expert witness?

12   A.  I think the last time I testified as an expert witness was

13   two or three years ago.

14   Q.  So you don't do it that often?

15   A.  No.

16   Q.  Have you ever testified for a defendant?

17   A.  Yes, many times.

18              MR. NACOL:  Thank you, sir, very much.

19              MR. KANE:  Your Honor, I would like to locate

20   Plaintiff's Exhibit 69, which was that watch marked into

21   evidence this morning.

22              Your Honor, may I approach the witness with Exhibit

23   72?

24              THE COURT:  You may.

25                      REDIRECT EXAMINATION

VOL.1-B Pg99

BY MR. KANE:

Q.  Professor McCarthy, Exhibit 72 is a genuine Rolex watch on which testimony this morning has indicated that the diamonds have been added to the dial and the diamond bezel has been added as a non-genuine, non-Rolex diamond bezel.  So this is a genuine watch with a non-genuine diamond dial and diamond bezel.

Now, in your opinion, is there any infringement of Rolex's rights by the marketing of that new watch?

A.  Yes, in my opinion, as I believe I previously testified, this would be both an infringement and a counterfeit item.

Q.  What remedy do you think would be necessary to protect Rolex's position with respect to that watch?

A.  Was this a new watch?

Q.  Yes, a new watch with a non-genuine diamond dial and diamond bezel added to the new watch.

A.  As I testified, I believe there should be an absolute injunction against such sales.

Q.  Thank you.  I was referring to part of your cross-examination when the word conversion got introduced into the questions and the answers, and the example of a Rolex stainless steel that got then recased into a gold Submariner was mentioned.  Do you remember that question and answer?

A.  Yes.

Q.  And your remedy there also was what?

SHANTEL BEHELER, CSR          METRO 817-226-1664

VOL.1-B Pg100

A.  Was an absolute injunction.

Q.  But that was not the only case in the facts before you today where you see the need for an absolute injunction?

A.  Regardless of what one calls a conversion or not a conversion, in my opinion both the type of watch you referred to that I was questioned about on cross, as well as to this watch which I am holding here, is in my opinion an infringement and a counterfeit, which falls within the category of absolute injunction required.

Q.  And the watch you are holding there is Plaintiff's Exhibit 69.  I will just note it for the record.

          MR. KANE:  Your Honor, no further questions.  Thank you.

          THE COURT:  Anything further of this witness?

          MR. NACOL:  No, Your Honor.

          THE COURT:  The witness may step down.

          MR. McGOWAN:  Your Honor, subject to calling Mr. Lorenz, who would be, you know, available as soon as the Court can hear him on or after February 21, the plaintiff rests.  I would like to mention that we would like to see the defense' exhibit, physical exhibits this afternoon rather than tomorrow.

          MR. NACOL:  I believe we can arrange that, Your Honor.

          MR. McGOWAN:  The only other thing I would like